811 So.2d 617 (2000)
Ex parte Roy BURGESS, Jr.
(In re Roy Burgess, Jr. v. State).
1980810.
Supreme Court of Alabama.
July 21, 2000.
*618 Bryan A. Stevenson and J. Drew Colfax, Equal Justice Initiative of Alabama, Montgomery, for petitioner.
Bill Pryor, atty. gen.; and Michael B. Billingsley and Kathryn D. Anderson, asst. attys. gen., for respondent.

*619 On Application for Rehearing

PER CURIAM.
The opinion of January 28, 2000, is withdrawn and the following is substituted therefor.
Roy Burgess, Jr., was convicted of capital murder for the death of Kevin Gardner, under § 13A-5-40(a)(2), Ala.Code 1975 murder made capital because it was committed during the course of a robbery in the first degree. Both Burgess and his victim were age 16 at the time the murder was committed. The jury recommended by a vote of 10-2 that Burgess be sentenced to life imprisonment without parole. The trial court, overriding the jury's recommendation, sentenced Burgess to death. The Court of Criminal Appeals affirmed Burgess's conviction and sentence. Burgess v. State, 811 So.2d 557 (Ala.Crim.App. 1998). This Court granted certiorari review pursuant to Rule 39(c), Ala. R.App. P.

I.
The Court of Criminal Appeals set forth the following detailed statement of the facts of the case.
"The state's evidence tended to show that on the afternoon of August 12, 1993, Burgess visited his friends Demetrius Stevenson, Richie Jones, Kevin Matthews, and Will Hatton at their apartment on Graymont Lane in Decatur. Burgess, who was 16 years old at the time, had a .25 caliber pistol in his possession; he complained to his friends that he needed money and proceeded to tell them about a plan to make money by robbing someone or by stealing a car or a car stereo. Testimony indicated that Burgess and the others sat around the apartment for some time discussing this plan. Sometime between 6:00 and 7:00 p.m. that evening, Burgess, Stevenson, and Jones got a ride to a local shopping mall from Larry Hays, who lived across the street from Stevenson and Jones. At the mall, Burgess remained in the parking lot while the others went inside. Stevenson and Jones testified that when they came out of the mall at around 8:30 p.m., they saw Burgess getting into a white truck in the parking lot. Stevenson and Jones then walked back to their apartment without Burgess. According to Stevenson and Jones, Burgess returned to their apartment sometime between 9:00 and 9:30 p.m. and told them that the people in the truck had given him a dollar but they `didn't have anything.' Burgess remained at the apartment for another 15 minutes before leaving by himself.
"Stevenson and Jones testified that Burgess returned to their apartment again at approximately 10:30 p.m. and asked them if they wanted to go to a party at Cedar Lake in Decatur. They testified that after agreeing to go to the party, they walked outside with Burgess, whereupon Burgess introduced them to 16-year-old Kevin Gardner, the victim, who was sitting in his car in the apartment parking lot. Stevenson and Jones testified that Burgess told them that Gardner had agreed to drive them to the party. The three men got into Gardner's car, with Burgess sitting in the front passenger seat and Stevenson and Jones sitting in the backseat. Gardner then proceeded to drive on Ray Avenue in Decatur, in the direction of Cedar Lake. Stevenson and Jones testified that Burgess and Gardner were engaged in some kind of conversation in the front seat, but that they could not hear what was being said because the car stereo was turned up so loud. Gardner continued to drive on Ray Avenue to a remote area where the road was no longer paved and there were no houses nearby. Stevenson and Jones testified that at that point, Gardner said that he did not *620 want to drive any farther and told his passengers that they would have to get out and walk. According to Stevenson and Jones, Burgess then opened his door and quickly turned around and shot Gardner in the head with his pistol. Stevenson and Jones testified that Burgess then pulled Gardner's body out of the car and dragged it to some bushes by the side of the road. Burgess then got behind the wheel of Gardner's car, and drove Stevenson and Jones back to the apartment on Graymont Lane.
"Kevin Matthews and Will Hatton were at the apartment when the three men arrived in Gardner's car. Testimony indicated that the group decided to drive Gardner's car to Birmingham to sell it to a `chop shop.' Before leaving for Birmingham, Stevenson went across the street to Larry Hays's apartment and told Hays what had happened. Stevenson then asked Hays to follow them to Birmingham. Stevenson, Jones, and Hatton rode to Birmingham with Hays in Hays's car, while Burgess and Matthews travelled in Gardner's car, with Burgess driving. After the group arrived in Birmingham, they were unable to find a `chop shop' where they could sell Gardner's car. They decided to leave Gardner's car in the parking lot of a Birmingham nightclub. Before abandoning Gardner's car, they took several items from the car, including the stereo equipment, several compact discs, and a portable compact disc player. They then returned to Decatur in Hays's car.
"Stevenson and Jones testified that the following day, August 13, 1993, they sold the stereo equipment that they had taken from Gardner's car. Later that same day, at approximately 5:30 p.m., Stevenson, Jones, and Matthews went to Stevenson's grandmother's house in the Cedar Lake area, close to where Gardner's body had been left. At that time, the three men decided to call the Decatur police. Jones telephoned the police, telling them that he and two of his friends had found a dead body while picking blackberries. The police officer who responded to the call met Stevenson, Jones, and Matthews at Stevenson's grandmother's house. The men then took the officer to Gardner's body. At that time, a homicide investigation was initiated, and several more officers were called to the scene. After questioning Stevenson, Jones, and Matthews at the scene, the police took down their names and allowed them to leave.
"The following day, August 14, 1993, law enforcement authorities located Gardner's car in Birmingham. With no other leads in their homicide investigation, Decatur police focused their suspicion on Stevenson, Jones, and Matthews. The three men were brought to the police station for questioning. The questioning was conducted individually. After initially denying any knowledge of Gardner's murder, all three men eventually told the police that Burgess had killed Gardner. After consulting with the district attorney, the police told Stevenson, Jones, and Matthews that if the evidence showed that they were telling the truth and that they had not killed Gardner, they would not be charged with Gardner's murder.
"After obtaining a [warrant] to arrest Burgess for Gardner's murder, Decatur police arrested Burgess at his parents' residence on August 16, 1993. Burgess was transported to the police station, where he gave police a statement. In his statement, Burgess maintained that on the evening of the shooting, he had seen Gardner coming out of a convenience store near the mall and had asked Gardner, whom he said he knew from school, for a ride to his friends' apartment on Graymont Lane. Burgess *621 stated that Gardner agreed to give him a ride and then drove him to the apartment. Burgess stated that when they arrived at the apartment, he tried to warn Gardner that Stevenson and Jones intended to rob him, but Gardner was not concerned. Burgess stated that Stevenson and Jones got into Gardner's car with him and that Gardner then proceeded to the remote area on Ray Avenue, where, Burgess stated, Stevenson and Jones intended to rob Gardner. Burgess stated that during the robbery, he pointed his gun at Gardner and that the gun accidentally discharged, shooting Gardner in the head.
"In compliance with their immunity agreements, the state did not prosecute Stevenson or Jones for any participation in the crime. Although Stevenson and Jones admitted at Burgess's trial that earlier on the day of the shooting they had participated in the discussion with Burgess concerning Burgess's plan to steal a car or a car stereo, both men testified that they had no prior knowledge of Burgess's intention to rob or to kill Gardner. Both men testified that when they left their apartment with Burgess and Gardner in Gardner's car, they believed Gardner was taking them to a party.
"The state also presented testimony from Roderick Reynolds, who was being held in the same juvenile detention facility as Burgess following Burgess's arrest. Reynolds testified that while he was in the juvenile detention facility with Burgess, Burgess told him that he had killed a `white boy' and had left the boy's body in some bushes.
"Burgess's theory of defense at trial was that his older companionsStevenson and Jonesconceived and organized the plan to steal a car or a car stereo to make some money and that Stevenson and Jones were the main participants in the robbery and murder of Gardner. Stevenson was 18 at the time of the offense, and Jones was 19. Contrary to his statement to police, Burgess testified at trial that he did not shoot Gardner and maintained instead that Stevenson had shot Gardner. Although he acknowledged that he had had a gun on the night of the murder, Burgess testified that it did not work. He maintained that Stevenson also had a gun. Burgess testified that after his arrest, he told the police that he had killed Gardner only because he thought the police would help him and that he would not be tried as an adult. Burgess further testified that on the day of the murder, a man came to the apartment on Graymont Lane to see Stevenson and to ask Stevenson to repay him money that he owed him. According to Burgess, Stevenson said that he would have to steal a car to get the money to repay the man. Burgess testified that he had asked Gardner for a ride to the apartment on Graymont Lane so that he could pick up his clothes and some food that he had left there earlier in the day. He maintained that he intended to walk home after retrieving these items, but that he did not do so because he felt responsible for Gardner and believed that he could not leave Gardner alone with Stevenson and Jones. Burgess presented the testimony of several witnesses who claimed that Stevenson had told them that he, and not Burgess, had shot Gardner."
811 So.2d at 564-66.
We have carefully reviewed the 25 issues raised by Burgess before this Court, and we conclude that the Court of Criminal Appeals thoroughly and correctly addressed the issues that relate to Burgess's conviction.
We address certain issues concerning Burgess's sentencing. Under our statutes, *622 a defendant who is convicted of a capital offense is entitled to a sentencing hearing. §§ 13A-5-45 through -53, Ala. Code 1975. After the jury has returned an advisory verdict, as this jury did, the trial court must permit the parties to present arguments concerning the existence of aggravating and mitigating circumstances. § 13A-5-47. The opinion of the Court of Criminal Appeals sets out the aggravating and mitigating circumstances that the trial court found to exist in Burgess's case:
"The record reflects that the trial court found the existence of one statutory aggravating circumstance in Burgess's case: that the murder was committed during the course of a robbery in the first degree. The trial court found the existence of two statutory mitigating circumstances: (1) that Burgess had no significant history of prior criminal activity; and (2) that Burgess was 16 years old at the time of the offense. The trial court further found the existence of the following nonstatutory mitigating circumstances: (1) that Burgess had a good family background and `early rearing in the church'; (2) that Burgess had obtained his GED certificate while incarcerated for the present offense; (3) that Burgess's relationship with his family was based on love and that his family, along with a friend of Burgess's, pleaded with the trial court for mercy; (4) that Burgess did not act alone in the commission of the offense; (5) that Burgess was examined by a psychologist with the Department of Mental Health and Mental Retardation and it was determined that he suffered from an antisocial personality disorder; and (6) that the jury had recommended by a vote of 10-2 that Burgess be sentenced to life imprisonment without parole."
811 So.2d at 604.
The trial court, after conducting the sentencing hearing, is then required, pursuant to § 13A-5-47(e), to "determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist," and that statute provides that "in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict." Although the statute provides that the trial court must consider the jury's recommendation, that recommendation is not binding on the court. Section 13A-5-48 discusses the weighing process required of the trial court.
"The process described in ... Section 13A-5-47(e) of weighing the aggravating and mitigating circumstances to determine the sentence shall not be defined to mean a mere tallying of aggravating and mitigating circumstances for the purpose of numerical comparison. Instead, it shall be defined to mean a process by which circumstances relevant to sentence are marshalled and considered in an organized fashion for the purpose of determining whether the proper sentence in view of all the relevant circumstances in an individual case is life imprisonment without parole or death."
In its sentencing order, the trial court concluded that the one aggravating circumstance in Burgess's case outweighed all of the mitigating circumstances.

II.
We first consider Burgess's contention that in sentencing him to death the trial judge improperly considered his juvenile record and his adjudications of juvenile delinquency. Burgess argues that after the jury voted 10-2 to recommend that he receive a sentence of life imprisonment without parole, the trial court improperly relied on his juvenile history to override the jury's recommendation and impose the death penalty. Burgess argues that the trial court erred by considering his history of juvenile adjudications to negate the statutory *623 mitigating circumstances of his lack of a significant criminal history and his age at the time the offense was committed. He contends that the trial court "deploy[ed] the prior delinquencies as if they were nonstatutory aggravation to effectively tip the balance in favor of death."
Section 13A-5-47(b), Ala.Code 1975, requires that the trial court order and receive a written presentence investigation report "[b]efore making the sentencing determination," and that "[t]he report and any evidence submitted in connection with it shall be made part of the record in the case." Rule 26.3(b), Ala. R.Crim. P., provides for what may be contained in such a presentence report. When a defendant has a significant juvenile record, his or her teenage difficulties will appear as part of the presentence report. However, under the Alabama capital-sentencing scheme, juvenile adjudications are not convictions and cannot be considered as prior criminal activity. Freeman v. State, 555 So.2d 196, 212 (Ala.Crim.App.1988), aff'd, 555 So.2d 215 (Ala.1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990). Only convictions can negate the statutory mitigating circumstance of no significant history of prior criminal activity. § 13A-5-51(1), Ala.Code 1975; Freeman v. State, 651 So.2d 576, 597-98 (Ala.Crim.App. 1994).
The fact that a trial court has access through the presentence report to the juvenile record of a defendant convicted of a capital crime, but cannot consider juvenile adjudications to negate the mitigating circumstance of the lack of any significant history of prior criminal activity, appears to be a contradiction. In discussing that issue, the Court of Criminal Appeals concluded that although juvenile adjudications cannot be used to negate the mitigating circumstance, the trial court can consider them when conducting the weighing process required in capital cases. The Court of Criminal Appeals stated:
"Although it is well-settled law in Alabama that juvenile adjudications cannot be used to negate the statutory mitigating circumstance that the defendant has no significant history of prior criminal activity, Freeman, supra, 555 So.2d at 212, the courts of this state have never held that the trial court must entirely ignore a defendant's juvenile adjudications in performing its `weighing' duties. The trial court's consideration of a defendant's juvenile adjudications when conducting the weighing process offends neither general constitutional principles nor specific provisions of Alabama law. In fact, Alabama's capital punishment statute contemplates that the trial court will have any prior juvenile record of the defendant before it when it is deciding upon the proper sentence: pursuant to § 13A-5-47, Ala.Code 1975, the trial court is required to consider the presentence report of a defendant convicted of capital murder, and Rule 26.3(b)(2), Ala. R.Crim. P., specifically provides for the inclusion of the defendant's prior juvenile record in the presentence report.
"To hold that the trial court is prohibited from considering a defendant's juvenile adjudications in its individualized assessment of the weight to assign to the statutory mitigating circumstance of `no significant history of prior criminal activity' would obligate the trial court to assign precisely the same weight to this mitigating circumstance in every case where, such as here, a juvenile defendant is convicted of capital murder. Under this view of the capital sentencing scheme, two juveniles, both the same age and both convicted of capital murder, one with no prior juvenile record and the other with a very significant prior juvenile record, would necessarily benefit equally from the statutory mitigating *624 circumstance of `no significant history of prior criminal activity.' This would amount to an endorsement of the sort of numerical `tallying' disallowed by § 13A-5-48, Ala.Code 1975, and an abjuration of the weighing function mandated by § 13A-5-47(e), Ala.Code 1975.
"Alabama's capital punishment statute does not specify the matters the trial court may consider when engaging in the process of weighing the aggravating circumstances and the mitigating circumstances in a particular case. Nor does the statute require the trial court to make express findings explaining the process by which it weighed the aggravating circumstances and the mitigating circumstances. We conclude that a trial court may, consistent with Alabama law, deem a defendant's juvenile adjudications to be a relevant consideration in its assessment of the weight to assign to the statutory mitigating circumstances of a defendant's lack of a significant criminal history and a defendant's age at the time of the offense."
811 So.2d at 606.
We agree with the Court of Criminal Appeals' conclusion that a trial court may consider a defendant's juvenile adjudications to be a relevant consideration in deciding what weight to assign to the statutory mitigating circumstances of a defendant's lack of a significant prior criminal history and a defendant's age at the time of the offense. Other courts considering this dilemma have come to the same conclusion as did the Court of Criminal Appeals. See, e.g., United States v. Pretlow, 770 F.Supp. 239, 243 (D.N.J.1991) (applying New Jersey law); Scott v. Dugger, 686 F.Supp. 1488, 1508 (S.D.Fla.1988), aff'd, 891 F.2d 800 (11th Cir.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990) (applying Florida law); State v. Bays, 87 Ohio St.3d 15, 33-34, 716 N.E.2d 1126, 1145 (1999), cert. denied, 529 U.S. 1090, 120 S.Ct. 1727, 146 L.Ed.2d 647 (2000); State v. Rodriguez, 656 A.2d 262, 277-78 (Del.Super.Ct.1993). Nevertheless, Alabama law explicitly precludes a trial court from using juvenile adjudications to negate the mitigating circumstance of no significant history of prior criminal activity. Ex parte Davis, 718 So.2d 1166, 1178 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999). In other words, during the sentencing process in a capital case, the trial court may use a defendant's juvenile record to diminish the weight to be accorded the mitigating circumstance of that defendant's lack of a significant history of prior criminal activity, as well as the mitigating circumstance of that defendant's age at the time he or she committed the capital offense, but the trial court may not use the juvenile record as the basis for giving little or no weight to such mitigating circumstances.
We disagree, however, with the Court of Criminal Appeals' conclusion that the trial court in this case did not improperly consider Burgess's juvenile adjudications to negate the mitigating circumstances it found to exist. The trial court's sentencing order shows that Burgess's juvenile record was a conspicuous and dominating factor in the trial court's weighing process. The trial court's sentencing order read, in pertinent part:
"The Court has independently weighed the jury's verdict. The verdict was ten to two, recommending a sentence of life imprisonment without parole. The Court's observation of the selection process leads it to believe that this jury had few reservations about imposing the death penalty under the proper circumstances when the trial began. Further, the Court is of the opinion that the jurors understood the charges and instructions given to them. The Court has no reason to suspect that the members of the jury reached their *625 verdicts in disregard of their oath or the instructions of this Court.
"Given that only two members of the jury recommended death following their conviction of the defendant, the jury's verdict indicates a strong consensus that life without parole is the most appropriate punishment.
"The Court cannot pretend to know why the jury reached the recommendation that it did; however, it is the opinion of the Court that the defendant's age, his lack of a significant criminal history and the fact that his accomplices have not been made to answer for their involvement in this offense were important factors in their decision.
"Based upon the information set forth above, the Court determines that a mitigating circumstance DOES EXIST with respect to the sentencing recommendation returned by the jury.
". . . .
"The Court now proceeds to weigh the aggravating and mitigating circumstances to determine the appropriate sentence under the law. The Court has not merely tallied for the purpose of numerical comparison the aggravating and mitigating circumstances, but has marshalled and considered in organized fashion, for the purpose of determining the proper sentence, all of the circumstances in this case whether aggravating or mitigating, including all relevant circumstances whether enumerated in the criminal code or not.
"Consideration of the aggravating circumstances, presented by the prosecution at the `penalty phase' of these proceedings, has led the Court to draw several conclusions with regard to the appropriate sentence:
"The Court is presented with only one aggravating circumstance for its consideration, that being that the victim's murder took place during the course of a Robbery in the First Degree or an Attempt Thereof. There are, nevertheless, several aspects of this aggravating factor that the Court finds particularly disturbing and uncharacteristic of most homicides seen by this Court.
"First, this offense shows an unusual[ly] high degree of premeditation. The defendant and his accomplices thought through their scheme and had even considered how they would dispose of the victim's automobile before the automobile or the victim had even been selected. It was the defendant who selected the car, selected the victim and lured the victim away from a public place.
"The evidence was that the defendant was careful to pick just the right victim. In fact, he apparently passed several potential victims, earlier in the day, until he found both the victim and automobile that he wanted.
"The Court notes that, in selecting a victim, the defendant made no attempt to conceal his identity or to choose a victim who was a stranger, rather, he selected a fellow classmate, someone whom he knew and could take into his confidence. The defendant picked a young victim who was not likely to have a weapon on him, all the time secure in the knowledge that he himself was carrying a firearm.
"It is apparent from the evidence that the defendant had more than ample opportunity to abandon his plan. Even after selecting a victim, he could have abandoned the plan prior to reaching his accomplice[s'] apartment, before the entourage left for Ray Avenue, or during the ride to Ray Avenue. However, the defendant [chose] to remain steadfast in his plan.
"The second disturbing characteristic that the Court wishes to note is the *626 senselessness of the killing itself. There was no evidence whatsoever that the victim resisted his assailants at all. In fact, the evidence was that no demand was ever made for his car. The victim was simply lured to the murder scene and killed, all efforts to take his car being made thereafter. The Court also notes that, had the defendant and his accomplices been worried about potential identification by the victim, they could have simply selected a stranger, or at the very least, made some attempt to conceal their identities. In fact, if theft were all the defendant had in mind, he could have accomplished that without ever having to leave the parking lot where he encountered the victim. After all, he had the advantage of having a gun. This murder was clearly unprovoked and defies any rational explanation.
"Consideration of the arguments presented on the issue of mitigation has [led] the Court to conclude the following:
"First, the Court found that the defendant does not have a significant history of prior criminal activity. Normally, this would be a very strong mitigating factor; however, the youthful age of the defendant cuts sharply against the weight of this mitigating factor. The defendant, at the time of the offense, was only sixteen years of age. The fact that the defendant was a juvenile prevented him from being able to have a criminal record of any significance, juvenile offenses not being recognized as criminal offenses. In fact, the pre-sentencing report indicates that the defendant was adjudged delinquent on a number of occasions for offenses that, had he been an adult, would have contributed to the building of a significant criminal history. Therefore, while the defendant does lack a significant criminal history, the defendant's age and his proven propensity to engage in illegal conduct prevent the Court from placing much emphasis on this mitigating factor.
"Second, the Court assigned mitigation to the fact that the defendant was sixteen years of age at the time the offense was committed. Despite this finding, however, the defendant has been examined and determined to be competent and has through due process of law been certified by our justice system to be tried as an adult, and, while the Court concedes that youthful indiscretion can frequently explain aberrant behavior, it would be rare indeed to find a sixteen-year-old who could not appreciate the moral turpitude or legal consequences of the act of murder. This is especially true of an individual who was raised in the church by God fearing parents and educated in a very good public school system. Further, the Court notes that the defendant has spent a significant amount of time in this State's juvenile facilities and must therefore have a heightened sense of the necessity of constraining his conduct to the bounds of social acceptability. It is therefore the determination of this Court that while a mitigating circumstance DOES EXIST, with regard to the defendant's age, the weight that should be assigned to this mitigating factor is very little indeed.
"Third, the Court assigns some mitigation to the fact that the defendant had a history of church attendance....
"Fourth, the Court has assigned some mitigation to the fact that the defendant obtained his GED while incarcerated on this offense. Once again, however, this achievement falls flat when it is considered in light of the opportunities that the defendant had available to him.... Had the defendant truly been interested in his education and willing to discipline himself in order to achieve it, he would not have been the disruptive influence at *627 school that the pre-sentence report reveals him to have been.... He was a poor student and discipline problem at Austin High School prior to his incarceration, and it appears that pursuing his high school diploma was only something that he took seriously after being placed in confinement. The fact that he attained his GED so rapidly indicates, once again, that he had the ability to do much better, but [chose] not to. The defendant's attainment of his GED is, in the opinion of the Court, more reflective of the defendant's self interest than it is of any redeeming or admirable character traits.
"Fifth, the Court assigns some mitigation to the fact that the defendant's family and a friend made a plea of mercy on his behalf and that his family and friends loved him and that the love was reciprocal.... It is, nevertheless, the case, as the pre-sentence report reveals, that the defendant's mother asked juvenile authorities for assistance at least partially because of physical and verbal abuse that the defendant had displayed to his brothers. Quite frankly, there is nothing particularly noteworthy about this characteristic. While the Court will consider it as a mitigating factor, the amount of weight given to it will not be significant. Any love that the defendant was capable of expressing toward others seems to pale by comparison [to] the coldness that he displayed to the victim of this crime.
"Sixth, the Court assigns some mitigation to the fact that the defendant was diagnosed with a conduct disorder characterized as severe, solitary, aggressive type....
"Seventh, ... the Court noted that the defendant was previously diagnosed as being hyperactive and having attention deficit disorder....
"Eighth, the Court has assigned some mitigation to the fact that the defendant did not act alone in the commission of this offense. However, it is apparent from the facts in this case that the defendant was the individual who selected the victim and who was the one responsible for escalating the car theft into a homicide. It would appear from the evidence that it was the other boys' participation which was relatively minor by comparison to the defendant's. The fact that the other accomplices to this offense have not been made accountable for their participation is unfortunate, but does not in any way relieve the defendant of his culpability for this act. The Court further notes that it will not go behind the jury's verdict to question the credibility of the witnesses who testified against the defendant, that determination properly being the province of the jury.
". . . .
"Just as there is no doubt in the Court's mind that the jury felt compelled to return the verdict which it did, the Court is equally satisfied that the sentence of death is the appropriate sentence under the facts of this case. This decision has not been reached without great difficulty, especially considering the age of the defendant. However, the Court believes that this offense was precisely the kind of offense that the Legislature intended to punish capitally. While the Court gives a significant amount of mitigation to the fact that the jury recommended life, the Court notes that the jury did not have the benefit of the pre-sentencing report which paints a drastically different picture of the defendant than that which was presented in the `penalty phase.' It is the opinion of the Court, informed by years of practical experience in passing judgment on those who have violated the laws of this State, that the defendant is not the kind of individual who is likely to conform himself *628 to social rules whether they be the rules of society in general or those of the prison population.
"When considered together, the mitigating factors both statutory and nonstatutory and including that dealing with the jury's recommendation, do not, in the undersigned's opinion, outweigh the single aggravating factor in this case. Viewing all of the evidence and materials in the light most favorable to the defendant, the Court simply cannot escape the fact that this offense falls squarely within those offenses that the Legislature intended to punish capitally via the capital murder statute and those laws permitting a juvenile offender to be tried as an adult.
"It is clear to the Court that the aggravating circumstance in this case far outweighs the mitigating circumstances. The Court hereby REJECTS AND OVERRIDES the jury's verdict on punishment...."
The statements contained in the trial court's painstaking written order in this very difficult case reflect that the trial court relied upon Burgess's juvenile adjudications to give nominal weight not only to the two statutory mitigating circumstances, but also to other mitigating circumstances, including the jury's recommendation. The trial court's use of Burgess's juvenile recorduse indicated by the court's numerous references to that recordto discount to inconsequentiality the numerous mitigating circumstances, in favor of the one aggravating circumstance, was an abuse of discretion.

III.
We next consider Burgess's argument that the trial court erred in refusing to consider, as a mitigating circumstance, the extremely lenient treatment of Burgess's accomplices. He contends that the imposition of a death sentence is disproportionate when the state did not prosecute any of the older participants in this crime. Burgess reminds the Court that both Demetrius Stevenson and Richie Jones were in Kevin Gardner's car at the time of the robbery-murder. Both Stevenson and Jones admitted in their testimony at Burgess's trial that earlier on the day of the shooting they had participated in the discussion with Burgess concerning the plan to steal a car or a car stereo, and that they were in the car when Kevin Gardner was killed. These two men, along with Kevin Matthews, Will Hatton, and Larry Hays, all drove to Birmingham with Burgess in an attempt to sell Gardner's stolen car to a "chop shop" there. Stevenson removed and sold the stereo equipment from Gardner's car.
Section 13A-5-53(b)(3) requires that the sentence of death be neither excessive nor disproportionate to the penalties imposed in similar cases, considering both the crime and the defendant. In Ex parte Henderson, 616 So.2d 348 (Ala.1992), this Court treated the fact that the sentence imposed in the companion case was remitted from death by electrocution to life in prison without benefit of parole, as a factor the trial court must consider, and it remanded the cause for consideration of that factor. Id. at 350-51. Here, all of the other participants involved received complete immunity from prosecution, a factor to which the trial court assigned only "some mitigation." Given the fact that the defendant was the only one of six participants in this offense who was prosecuted, we conclude that the trial court should have given this factor greater weight.

IV.
Burgess further argues that the imposition of the death penalty in his case violates international law, because he was only 16 years old at the time of the commission of the capital offense. He contends *629 that Article 6(5) of the International Covenant on Civil and Political Rights provides that a sentence of death shall not be imposed for crimes committed by persons below 18 years of age. This Court thoroughly discussed an identical argument in Ex parte Pressley, 770 So.2d 143 (Ala. 2000), wherein we concluded that the death penalty can legally be imposed upon a 16-year-old charged with a capital offense. We affirm in this case our reasoning in Ex parte Pressley.

V.
The trial court provided a lengthy, written "Determination of Sentence by the Court," pursuant to § 13A-5-47, Ala.Code 1975. This Court has carefully studied this document, the record, the briefs filed in this case, the oral argument made on Burgess's behalf, and the opinion of the Court of Criminal Appeals, and has carefully considered all issues Burgess raised. We have searched the record of Burgess's trial for "plain error,"[1] i.e., error so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Rule 45, Ala. R.App. P. We find no error, "plain" or otherwise, that requires us to reverse Burgess's conviction.
However, for the reasons stated above, we remand this cause with instructions for the Court of Criminal Appeals to remand for the trial court to reevaluate Burgess's sentence and to consider whether, given Burgess's age, the treatment of the other participants, the jury's sentencing recommendation, and the fact that Burgess has no significant history of prior criminal activity, a death sentence is disproportionate in this case. The trial court should be instructed to resentence Burgess and, thereafter, to submit a written order including its findings and conclusions to the Court of Criminal Appeals within 90 days. The judgment of the Court of Criminal Appeals is affirmed as to the other issues presented by Burgess.
OPINION OF JANUARY 28, 2000, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION FOR REHEARING OVERRULED; AFFIRMED AS TO THE CONVICTION; REVERSED AS TO THE SENTENCE; AND REMANDED WITH INSTRUCTIONS AS TO SENTENCING.
HOOPER, C.J., and MADDOX, COOK, LYONS, and ENGLAND,[*] JJ., concur.
JOHNSTONE, J., concurs in part and concurs in the result in part, and concurs in the order overruling the application for rehearing.[**]
HOUSTON, J., concurs in the judgment affirming as to the conviction, reversing as to the sentence, and remanding, and concurs in the order overruling the application for rehearing.
SEE, J., concurs in the affirmance as to the conviction; dissents from the reversal as to the sentence; and dissents from the order overruling the application for rehearing.
BROWN, J., recuses herself.[***]
*630 JOHNSTONE, Justice (concurring in part and concurring in the result in part, and concurring in the order overruling the application for rehearing).
I concur with the main opinion except that I concur only in the result on the issue of the way to consider the statutory mitigating circumstance of "no significant history of prior criminal activity," § 13A-5-51(1), Ala.Code 1975, in the case of a young defendant with a record of adjudications of juvenile delinquency. This statutory mitigating circumstance presents a dilemma in this factual scenario. On the one hand, our law prohibits the court from considering the adjudications of juvenile delinquency to negate this statutory mitigating circumstance. Ex parte Davis, 718 So.2d 1166, 1178 (Ala.1998) ("[J]uvenile adjudications could not properly be used to negate the mitigating circumstance of `no significant history of prior criminal activity.'"), and Freeman v. State, 555 So.2d 196, 212 (Ala.Crim.App.), aff'd, 555 So.2d 215 (Ala.1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990). See also Baldwin v. State, 456 So.2d 117, 125 (Ala.Crim.App.1983), aff'd, 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). On the other hand, this statutory mitigating circumstance really is intended for the person who has obeyed the criminal laws until he or she has committed the capital murder being tried. While our society makes many allowances for youthful immaturity, and indeed has devoted a specific statutory mitigating circumstance to youthfulness, § 13A-5-51(7), Ala.Code 1975, the statutory mitigating circumstance of no significant history of prior criminal activity increases in applicability and importance as the age of the defendant increases during the years when the defendant could have incurred adult criminal convictions.
Thus in the factual scenario before us a young capital-murder defendant with a record of prior adjudications of juvenile delinquencythe most accurate analysis and application of the statutory mitigating circumstance of no significant history of prior criminal activity would seem to be, first, that this circumstance is necessarily due only minimal weight for a juvenile tried as an adult, and then only to the extent that the law authorized the transfer or other treatment of juveniles as adults for prosecution before the defendant committed the capital murder being tried; and, second, the weight of this circumstance increases in direct proportion to the age of the defendant over the maximum age for a juvenile. Thus, in the case before us, the circumstance of no significant history of prior criminal activity is necessarily due only minimal weight.
HOUSTON, Justice (concurring in the judgment affirming as to the conviction, reversing as to the sentence, and remanding).
Article VI, paragraph 2, of the Constitution of the United States provides:
"This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding."
The United States Supreme Court has interpreted this paragraph to mean what it says. Zschernig v. Miller, 389 U.S. 429, 440-41, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968); United States v. Pink, 315 U.S. 203, 230-31, 62 S.Ct. 552, 86 L.Ed. 796 (1942) ("state law must yield when it is inconsistent with or impairs the policy or provisions of a treaty").
*631 On September 8, 1992, the United States ratified the International Covenant on Civil and Political Rights ("ICCPR"); Article 6(5) of this treaty provides: "Sentence of death shall not be imposed for crimes committed by persons below eighteen years of age and shall not be carried out on pregnant women."
Roy Burgess was 16 years old when he committed the horrible crimes for which he has been sentenced to death.
The majority opinion indicates that the Justices concurring therein are satisfied that the United States Senate Reservation 1(2) relieves state justices from their constitutional obligation to be bound by this treaty.
The Senate Reservation begins with a clause reading: "The United States reserves the right...." This clause uses a singular verb. The following statement appears in Merriam Webster Dictionary of English Usage, p. 929 (1989): "[A]s the United States came to be thought of as a single entity, the singular verb came more and more into use." The Senate's reservation reads:
"The United States reserves the right, subject to its [singular pronoun] constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, including such punishment for crimes committed by persons below 18 years of age."
Federalism is alive and well. The United States Constitution binds me as a Supreme Court Justice of the State of Alabama to abide by the ICCPR, Article 6(5), and not to impose the sentence of death on Burgess for the crimes committed when he was 16 years of age. I am not persuaded that the Senate's reservation, if not invalid for other reasons, frees me as a state justice, as opposed to a federal justice or judge, from the treaty's restriction against the imposition of a sentence of death for a crime committed by a person below the age of 18 years.
In Domingues v. Nevada, 114 Nev. 783, 961 P.2d 1279 (1998), in a 3-2 decision, the Supreme Court of Nevada rejected the defendant's contention that the ICCPR prohibited the imposition of the death sentence for crimes committed by a 16-yearold. The Supreme Court of the United States denied the defendant's petition for certiorari review on November 1, 1999. 528 U.S. 963, 120 S.Ct. 396, 145 L.Ed.2d 309 (1999). I am aware that an order of the Supreme Court of the United States denying a petition for certiorari review is not to be taken as an expression of an opinion on the merits of the case. Maryland v. Baltimore Radio Show, 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562 (1950); Carpenter v. Gomez, 516 U.S. 981, 116 S.Ct. 488, 133 L.Ed.2d 415 (1995); however, I am also aware that when a petition raises a substantial question, the Court sometimes "points out those concerns which, although unrelated to the merits, justify the decision not to grant review." Carpenter v. Gomez, 516 U.S. 981, 116 S.Ct. 488. How much more substantial can a question be than whether a person can be executed for a crime committed in his youth, when the ICCPR, a treaty to which the United States is a signatory, makes such an execution facially illegal? However, the Court did not point out concerns justifying the decision not to grant review that were unrelated to the merits. Therefore, I do not believe it is a quantum leap for me to assume that certiorari review was denied based on the merits of the case.
In this present case, the defendant Burgess committed the capital crime when he was 16 years old; the jury recommended that he be sentenced to life imprisonment without parole for that crime. The trial court overrode that recommendation and *632 sentenced him to death, which the trial court had every right to do under the Constitution of the United States, Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), and which the trial court may have had a right to do under the Constitution of Alabama of 1901. See Ex parte Giles, 632 So.2d 577, 587-89 (Ala.1993) (Houston, J., concurring in the result); Ex parte Jackson, 672 So.2d 810, 811-13 (Ala.1995) (Houston, J., concurring in the result); Ex parte Scott, 728 So.2d 172, 191-92 (Ala.1998) (Houston, J., concurring specially).
Before I voted in this case, knowing that the State of Alabama is going to be named in a list with such countries as Iran, Iraq, Bangladesh, Nigeria, and Pakistan, as jurisdictions approving death sentences for persons under age 18, I reread Clarence Darrow's summation in the Leopold and Loeb case. Attorney for the Damned: Clarence Darrow in His Own Words, pp. 16-88 (Simon and Schuster, Inc.1957). Like Darrow, I wonder if
"[w]e are turning our faces backward toward the barbarism which once possessed the world. If Your Honor can hang a boy of eighteen, some other judge can hang him at seventeen, or sixteen, or fourteen. Someday, if there is any such thing as progress in the world, if there is any spirit of humanity that is working in the hearts of men, someday men would look back upon this as a barbarous age which deliberately set itself in the way of progress, humanity and sympathy, and committed an unforgivable act."
Attorney for the Damned, p. 82.
Even though I am not persuaded that the Senate's resolution removes the ICCPR prohibition in State courts, I infer that the United States Supreme Court indicated that it did. I concur in the result, and I pray that in doing so I am not committing "an unforgivable act."
SEE, Justice (concurring in the affirmance as to the conviction; dissenting from the reversal as to the sentence; and dissenting from the order overruling the application for rehearing).
I would grant the State's application for a rehearing in this case. After further consideration, I believe the trial court properly considered Burgess's juvenile record in deciding what weight to accord the statutory mitigating circumstance of Burgess's lack of a significant criminal history, and I believe that in light of that juvenile record the trial court properly gave little weight to that statutory mitigating circumstance. I disagree with the conclusion that the trial court used Burgess's juvenile record to "negate" the statutory mitigating circumstance of Burgess's lack of a significant criminal history. The trial court found that that mitigating circumstance existed but had little weight. I agree with the trial court.
Further, I cannot conclude that the trial court erred in failing to give more weight than it did to the State's leniency toward Stevenson and Jones as a mitigating factor. While it appears undisputed that Stevenson and Jones were Burgess's accomplices in stealing the car and the music equipment, Burgess's testimony is the only evidence indicating that either of them participated in killing Gardner or had any prior knowledge of an intention to kill Gardner. The trial court did consider as a nonstatutory mitigating circumstance the fact that Burgess was not alone at the time of the crime, but Burgess's testimony and that of Stevenson and Jones conflicted with respect to whether Stevenson and Jones were accomplices to capital murder. The trial court could have found that Stevenson and Jones were not accomplices to capital murder. If it did, then comparing the sentencing leniency toward Stevenson and Jones with the sentence imposed on *633 Burgess is inapposite. I have found no authority requiring such a comparison. Although Stevenson and Jones, who were older than Burgess and who were with Burgess during and after the murder, were not punished at all, it is not clear that they were as culpable as Burgess was. Thus, on further consideration, I conclude that the trial court's failure to give more weight to the State's leniency toward Stevenson and Jones as a mitigating circumstance is not error warranting a new sentencing hearing.
NOTES
[1] This case was initially reviewed pursuant to procedures applicable before Rule 39, Ala. R.App. P., was amended. The amendment of Rule 39 was effective May 19, 2000, as to death-penalty cases.
[*] Although Justice England was not a member of this Court when this case was orally argued, he has listened to the tape of oral argument.
[**] Although Justice Johnstone did not sit for oral argument, he has listened to the tape of oral argument.
[***] Justice Brown was a member of the Court of Criminal Appeals when that court considered this case.