[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 142 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 143 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 144 
The appellant, James Earl Walker, was convicted of capital murder for the killing of Bessie Lee Thweatt. The murder was *Page 145 
made capital because the appellant committed it during the course of a first-degree burglary. See § 13A-5-40(a)(4), Ala. Code 1975. The jury unanimously recommended that he be sentenced to death. The trial court accepted the jury's recommendation and sentenced the appellant to death. The appellant filed a motion for a new trial, which the trial court denied after conducting a hearing. This appeal followed.
The appellant raises some arguments on appeal that he did not raise at trial. Although the lack of an objection at trial will not bar our review of an issue in a case that involves the death penalty, it will weigh against any claim of prejudice the appellant may raise. See Ex parte Kennedy, 472 So.2d 1106 (Ala. 1985). Rule 45A, Ala. R.App. P., provides:
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review . . . whenever such error has or probably has adversely affected the substantial right of the appellant."
"[This] plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" UnitedStates v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046,84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152,163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982)).
Because the appellant does not challenge the sufficiency of the evidence to support his conviction, a lengthy recitation of the facts is not necessary. However, we have reviewed the evidence, and we have determined that it is sufficient to support the appellant's conviction. The following summary of the relevant facts, which the trial court prepared, may be helpful to an understanding of this case:
 "The victim, Bessie Lee Thweatt, was at home on the night of January 5, 2000. The 87-year-old woman lived in the same house in rural Houston County, Alabama, for the past 67 years. She was petite in stature and weighed approximately 112 pounds. She was known to keep money inside the home and her vehicle.
 "On that fateful night, [Rex Allen] Beckworth and stepbrother, James Earl Walker appeared at the Thweatt home. The outside carport light was broken and the phone lines to the house were cut. The assailant broke the back window and entered the home. Mrs. Thweatt's blood soaked body was later discovered inside her home, which had been ransacked. She was pronounced dead at the scene.
 "After the murder Walker and Beckworth went to Motel 6 where Walker's sister worked. Beckworth was driving Walker's vehicle. She rented a room to them in her name at Walker's request. She saw a .22 caliber rifle in the trunk.
 "A hunter found a .22 caliber semi-automatic rifle in the creek at Power Dam Road. He called the Houston County Sheriff's Department and helped retrieve the gun from the water. A State forensic firearm examiner determined that bullet fragments taken from the Thweatt home were .22 caliber. However, the bullets were damaged and the firearm expert could not form an opinion as to a match, although he indicated they were similar. A .22 caliber casing was found at the Thweatt home. The firearm examiner determined that this casing was fired from the .22 caliber rifle pulled from the creek.
 "Houston County Sheriff's Department investigators focused their attention on Walker and Beckworth. They were known to be living in Etowah *Page 146 
County, Alabama. Ron Jones, an officer with the Hokes Bluff Police Department, knew both Defendants. Providing assistance to the Houston County Sheriff's Department, Officer Jones went to the Defendant's mobile home in June 2000, Defendant Beckworth ran out the other door and Defendant Walker hid underneath the loveseat in a fetal position. Officer Jones took Walker into custody.
 "Once Walker was returned to Houston County from Etowah County he took investigators to the scene of the crime. On video he explained how the two approached the house and that Beckworth broke the rear window and entered the home through that window. He claimed that he never entered the home and later ran from the area when he heard a gunshot. However, a jail inmate, Tim Byrd, testified that Walker admitted to him that he (Walker) had done the killing. Byrd stated that Walker wanted to clear his conscience.
 "Dr. Alfredo Parades, a forensic pathologist, performed the autopsy on Mrs. Thweatt. Dr. Parades found that the victim was shot at close range due to gunpowder residue on her face. He also noted there were numerous lacerations on the face and three fractures to the cheek. There were a total of nine injuries from blunt force trauma, which included two fractures of the skull. Dr. Parades opined that the victim was alive during the blunt force trauma injuries and, these injuries preceded the gunshot wound to the head. The gunshot wound caused the victim's death. Dr. Parades also testified that Mrs. Thweatt suffered pain.
 "The defense produced four witnesses[. P]erhaps the most important was Mark Peacock who was the victim's grandson. He testified that he knew co-defendant Beckworth from his days as an inmate at Clio. They were incarcerated at the same place. There were discussions between them about Mrs. Thweatt keeping money at her home."
(C.R. 349-51) (footnote omitted).
 I.
The appellant's first argument is that the trial court erred in denying his motion to dismiss or remand the indictment because it allegedly was defective. Citing Apprendi v. New Jersey,530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v.Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), he specifically contends that the indictment was defective because it did not set forth the aggravating circumstances upon which the State intended to rely. We addressed and rejected a similar argument in Stallworth v. State, 868 So.2d 1128, 1186
(Ala.Crim.App. 2001), as follows:
 "Stallworth also argues, in relation to the Ring
issue, that his indictment was void because it failed to include in the indictment the aggravating circumstances the State intended to prove. In Poole v. State, 846 So.2d 370 (Ala.Crim.App. 2001), we held that, although Apprendi required that the facts that increased a sentence above the statutory maximum must be submitted to a jury, those facts did not have to be alleged in the indictment. Recently, the Alabama Supreme Court adopted our holding in Poole. See Hale v. State, 848 So.2d 224 (Ala. 2002).
 "Also, the holdings in Poole and Hale are consistent with prior caselaw, which holds that aggravating circumstances do not have to be alleged in the indictment. See Ex parte Lewis, 811 So.2d 485 (Ala. 2001), and Dobard v. State, 435 So.2d 1338 (Ala.Crim.App. 1982). Stallworth's argument is not supported by Alabama law." *Page 147 
(Footnote omitted.) Accordingly, the appellant's argument is without merit.
 II.
The appellant's second argument is that the trial court erred in refusing to require the jury to return specific findings as to which aggravating circumstance or circumstances it found to exist. We addressed and rejected a similar argument in Adams v.State, [Ms. CR-98-0496, August 29, 2003] ___ So.2d ___, ___ (Ala.Crim.App. 2003), as follows:
 "Adams argues, for the first time on appeal, that Alabama's death-penalty statute is unconstitutional because it does not require that the jury make specific findings about what aggravating circumstances it found to exist and it does not specify the weight that a trial court is to give the jury's recommendation.
 "In Haney v. State, 603 So.2d 368, 388
(Ala.Crim.App. 1991), aff'd, 603 So.2d 412 (Ala. 1992), this Court rejected a similar claim that the jury must make findings concerning the aggravating circumstances it found to exist. The Court stated:
 "`We have previously addressed this issue and concluded that there is no statutory or constitutional requirement that the jury make specific findings of aggravating or mitigating circumstances during the sentencing phase of a capital case under Alabama's capital offense statute.'"
Therefore, the trial court did not err when it refused to require the jury to return specific findings as to which aggravating circumstance or circumstances it found to exist. Accordingly, the appellant's argument is without merit.
The appellant also argues that
 "[t]he clear interpretation of the Court's order is that the trial court determined the existence of aggravating circumstances beyond a reasonable doubt and not the jury. Even more troubling is that the Court found the existence of two aggravating circumstances. The jury verdict implies that an aggravating circumstance existed, although not to the level of beyond a reasonable doubt, but it is impossible to determine whether one or both of the aggravating circumstances existed in the mind of the jury. Furthermore, the jury could have based its decision on one factor while the Court based its decision on another, different, factor. It is impossible to reconcile the decisions of the judge and jury as to the finding of aggravating circumstances and it is clear that the jury made no such findings beyond a reasonable doubt. As such the Trial Court erred in not allowing the jury to make specific findings and thus violated the holding of Ring."
(Appellant's brief at pp. 22-23.)
In Ex parte Waldrop, 859 So.2d 1181, 1187-88 (Ala. 2002), the Alabama Supreme Court explained:
 "It is true that under Alabama law at least one statutory aggravating circumstance under Ala. Code 1975, § 13A-4-49, must exist in order for a defendant convicted of a capital offense to be sentenced to death. See Ala. Code 1975, § 13A-5-45(f) (`Unless at least one aggravating circumstance as defined in Section 13A-5-49 exists, the sentence shall be life imprisonment without parole.'); Johnson v. State, 823 So.2d 1, 52 (Ala.Crim.App. 2001) (holding that in order to sentence a capital defendant to death, the sentencer `"must determine the existence of at least one of the aggravating circumstances listed in [Ala. Code 1975,] § 13A-5-49"' (quoting Ex parte Woodard, 631 So.2d 1065, 1070 (Ala.Crim.App. 1993))). Many capital offenses *Page 148 
listed in Ala. Code 1975, § 13A-5-40, include conduct that clearly corresponds to certain aggravating circumstances found in § 13A-5-49:
 "`For example, the capital offenses of intentional murder during a rape, § 13A-5-40(a)(3), intentional murder during a robbery, § 13A-5-40(a)(2), intentional murder during a burglary, § 13A-5-40(a)(4), and intentional murder during a kidnapping, § 13A-5-40(a)(1), parallel the aggravating circumstance that "[t]he capital offense was committed while the defendant was engaged . . . [in a] rape, robbery, burglary or kidnapping," § 13A-5-49(4).'
 "Ex parte Woodard, 631 So.2d at 1070-71
(alterations and omission in original).
 "Furthermore, when a defendant is found guilty of a capital offense, `any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.' Ala. Code 1975, § 13A-5-45(e); see also Ala. Code 1975, § 13A-5-50 (`The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.'). This is known as `double-counting' or `overlap,' and Alabama courts `have repeatedly upheld death sentences where the only aggravating circumstance supporting the death sentence overlaps with an element of the capital offense.' Ex parte Trawick, 698 So.2d 162, 178 (Ala. 1997); see also Coral v. State, 628 So.2d 954, 965 (Ala.Crim.App. 1992).
 "Because the jury convicted Waldrop of two counts of murder during a robbery in the first degree, a violation of Ala. Code 1975, § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, Ala. Code 1975, § 13A-5-49(4), was `proven beyond a reasonable doubt.' Ala. Code 1975, § 13A-5-45(e); Ala. Code 1975, § 13A-5-50. Only one aggravating circumstance must exist in order to impose a sentence of death. Ala. Code 1975, § 13A-5-45(f). Thus, in Waldrop's case, the jury, and not the trial judge, determined the existence of the `aggravating circumstance necessary for imposition of the death penalty.' Ring, 536 U.S. at 609, 122 S.Ct. at 2443. Therefore, the findings reflected in the jury's verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all Ring and Apprendi require."
(Footnote omitted.)
Because the jury convicted the appellant of the capital offense of burglary-murder, that statutory aggravating circumstance was proven beyond a reasonable doubt. Therefore, in this case, the jury, and not the judge, determined the existence of the "aggravating circumstance necessary for imposition of the death penalty." Ring, 536 U.S. at 609, 122 S.Ct. at 2443. Further, because the jury found the existence of one aggravating circumstance, the appellant was exposed to or eligible for the death penalty, and "[t]he trial court's subsequent determination that the murder[was] especially heinous, atrocious, or cruel is a factor that has application only in weighing the mitigating circumstances and the aggravating circumstances." Waldrop,859 So.2d at 1190. Accordingly, there was not a Ring violation in this case, and the *Page 149 
appellant's arguments to the contrary are without merit.
 III.
The appellant's third argument is that his attorneys rendered ineffective assistance. Specifically, he contends that his attorneys did not adequately prepare for "a very key witness" and that one of his attorneys had represented the witness in previous criminal matters. (Appellant's brief at p. 24.)
The last witness the State called was Timothy Byrd, who had been incarcerated in the Houston County Jail with the appellant after the victim was murdered and to whom the appellant had allegedly made a statement about his involvement in the murder. Before Byrd testified, defense counsel objected on the ground that the veniremembers had not been questioned about him during the voir dire proceedings and on the ground that they had not been given notice of the statement the appellant allegedly made to him. However, after the prosecutor showed lead defense counsel his initials and a date on Byrd's statement, lead defense counsel agreed that the State had provided the statement in discovery.
The trial court then asked the jurors if they were related to or knew Byrd, and no one responded. Afterward, Byrd testified. Specifically, he stated that he and the appellant were cellmates in the Houston County Jail after June 2000; that the appellant said that he pulled the trigger and killed the victim; that it was bothering him and causing him to cry and to have bad dreams; and that he went with his brother, Rex Beckworth. Defense counsel next cross-examined him, asking about whether he was trying to get concessions on pending charges or a reduction on sentences when he first contacted authorities about the appellant's statement and about whether he had contacted officials in other instances about providing similar information. On redirect examination, Byrd testified that one of the appellant's attorneys had represented him on the charges for which he was in the Houston County Jail with the appellant.
The attorney who had previously represented Byrd subsequently moved for a mistrial, arguing that the State had brought the fact of his previous representation to the jury's attention. The trial court denied the motion, stating, "[Y]ou are Co-Counsel and [the other attorney] is Lead Counsel in this case. He handled the witness, Byrd, and I really didn't see it affecting you at all, quite frankly." (R. 1060.)
After a recess, the appellant asked the trial court to remove his attorneys because they had not given him Byrd's statement and because co-counsel had previously represented Byrd. The trial court discussed the situation with defense counsel and the prosecutor, and lead defense counsel agreed that the appellant's request was reasonable in light of the fact that he had apparently mislaid the statement. However, everyone, including the appellant, was concerned about the appellant proceeding through the trial without counsel or with new counsel. Finally, defense counsel asked for time until the next morning to determine how to deal with the situation. In conjunction therewith, defense counsel asked to have Byrd available for further cross-examination the next day; immediate access to jail records regarding Byrd and the appellant; a chance to talk to the appellant after the day's proceedings and before he was returned to the jail; and access to letters or written communications from Byrd to the district attorney regarding providing information about other inmates. The trial court granted the requests. *Page 150 
The next morning, lead defense counsel recalled Byrd and questioned him extensively about his prior convictions; whether he had known the appellant before they were incarcerated in the Houston County Jail and whether they had had an argument over the telephone and a subsequent physical altercation; whether he had repeatedly tried to get his sentence(s) reduced; whether, in conjunction therewith, he had written letters to the circuit clerk, a circuit judge, and the district attorney; whether he had previously offered to provide information about other inmates on at least two other occasions; and whether he had been given medication for mental problems.
During the hearing on the appellant's motion for a new trial, lead defense counsel testified that he did not feel like he was able to prepare adequately for Byrd's testimony and that he did not have time to locate witnesses who might have contradicted Byrd's testimony. However, he admitted that the trial was recessed until the next morning; that he and co-counsel reviewed the circuit clerk's files on Byrd and found extensive correspondence between Byrd and the circuit clerk and a circuit judge; and that the district attorney gave them documents that related to the situation with Byrd. Co-counsel also testified, stating that the trial court gave them a recess for the balance of a day to prepare for further examination of Byrd; that he had the circuit clerk's office search for letters from Byrd; that he reviewed documents that were produced by the circuit clerk's office and the district attorney's office; and that he contacted the jail, but did not learn anything of value. Co-counsel also testified that he did not use any confidential information that he had obtained in representing Byrd during the trial.
To prevail on an ineffective-assistance-of-counsel claim, the appellant must show that 1) his counsel's performance was deficient and 2) he was prejudiced by the deficient performance.See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674 (1984).
 "In determining whether a defendant has established his burden of showing that his counsel was ineffective, we are not required to address both considerations of the Strickland v. Washington test if the defendant makes an insufficient showing on one of the prongs. Id. at 697, 104 S.Ct. at 2069. In fact, the Court explained that `[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' Id.
We defer to this guidance and address the `prejudice' prong, for `[w]ith respect to the prejudice component, the lack of merit of [Thomas's] claim is even more stark.' Id. at 699, 104 S.Ct. at 2070."
Thomas v. State, 511 So.2d 248, 255 (Ala.Crim.App. 1987) (footnote omitted).
In this case, although defense counsel had not prepared initially for Byrd's testimony, there is not any indication that that initial lack of preparation prejudiced the appellant. During his initial cross-examination of Byrd, lead defense counsel thoroughly questioned him about his motive for testifying against the appellant and about whether he had offered to testify against other inmates. The trial court then gave counsel extra time to investigate Byrd and to prepare to examine him further. During that time, counsel obtained records from the circuit clerk's office, the district attorney's office, and the sheriff's department/jail, which they subsequently used in questioning Byrd. The next morning, lead defense counsel questioned Byrd extensively about a prior argument and/or altercation *Page 151 
with the appellant; his motive for testifying; his prior convictions; his prior offers to testify against other inmates; and his repeated attempts to get his sentence(s) reduced. Under these circumstances, we do not find that the appellant was prejudiced by the initial lack of preparation.
Also, the record does not indicate that the appellant was prejudiced by the fact that co-counsel had previously represented Byrd. Although co-counsel could not provide confidential information from his files, lead defense counsel was able to gain much of the same information from the documents that were produced by the circuit clerk's office, the district attorney's office, and the sheriff's department/jail. Furthermore, as the trial court noted, lead defense counsel conducted the examination of Byrd. Therefore, we do not find that the appellant was prejudiced in this regard.
Because the appellant was not prejudiced by his attorneys' initial lack of preparation or by co-counsel's previous representation of Byrd, he is not entitled to relief underStrickland.
 IV.
The appellant's fourth argument is that the prosecutor made improper comments and arguments during his trial.
During the jury selection proceedings, the following occurred:
 "[PROSECUTOR]: Now, I hate to mention this, but you need to. You read the paper, you are very intelligent, you are very smart and you read about what the Governor did in the State of Illinois; what he did about the Death Penalty? All the cases were commuted and changed. You know, the victims never got a chance to talk to —
 "[DEFENSE COUNSEL]: Your Honor, I object and I would like to approach the Bench.
"THE COURT: Approach.
"[PROSECUTOR]: I will withdraw it.
 "[DEFENSE COUNSEL]: I would still like to approach, Your Honor.
"THE COURT: Approach.
 "(Thereupon, the Attorneys of Record and the Court Reporter approached the Bench and the following proceedings were held out of the hearing of the Jury Venire, to-wit:)
 "[DEFENSE COUNSEL]: Your Honor, the Defendant objects to [the prosecutor] raising the matter of the commutation of sentences or the moratorium on the Death Penalty. Either one of those things are not relevant to what happens today. We have no way of knowing at this point how many people out there were aware of that before [the prosecutor] made the statement. So first, we ask that the Jury be told that what he said is stricken from the record.
"[PROSECUTOR]: If I could respond?
"THE COURT: Are you through?
 "[DEFENSE COUNSEL]: That is the first relief we seek. And after [the prosecutor] responds, we will ask for —
 "THE COURT: I will hear the whole thing and then I will let [the prosecutor] respond and I will go back and forth.
 "[DEFENSE COUNSEL]: Yes, sir. And then, regardless of the Court's ruling on my Motion to Strike, we move for a mistrial on the grounds what [the prosecutor] has brought up has tainted the Jury Panel. And, in support of that, we refer to all of the authorities we have previously cited in the separate Memorandum of Case Law and Authority. Thank you. *Page 152 
"THE COURT: Thank you. [Prosecutor].
 "[PROSECUTOR]: I could respond where I am going, Judge, talking about the police officers, law enforcement had experience that caused them, you know, to, unable to listen to police officers or deputies or because what they have read or heard all people who commit Capital Cases are innocent. There are not, allegedly, guilty people out there. That is the purpose of the question.
"THE COURT: The objection is sustained.
 "[DEFENSE COUNSEL]: As to the Motion to Strike, Your Honor?
 "THE COURT: It will be stricken and I will instruct the Jury that. And, the Motion for Mistrial is denied.
"[DEFENSE COUNSEL]: Thank you, Your Honor.
 "(Thereupon, the above named individuals returned to their places in the Court Room and the following proceedings were held in the presence and hearing of the Jury Venire, to-wit:)
 "THE COURT: Ladies and Gentlemen, the last remark by the District Attorney is stricken. You shall not consider that remark in any way."
(R. 413-16.)
Subsequently, during the prosecutor's penalty phase rebuttal closing argument, the following occurred:
 "Do you reward him by giving him the lowest punishment you can give him in this case by saying, [defense counsel], we give you Life Without Parole and you go to the penitentiary and you stay there the rest of your life. Who has to feed him? Who has to clothe him? Who has to pay for his medical expenses?
 "[DEFENSE COUNSEL]: Your Honor, I am going to Object on the grounds that that is an appeal to interest, Your Honor.
"THE COURT: Sustained.
 "[DEFENSE COUNSEL]: I ask you to instruct the jury to —
 "THE COURT: Ladies and Gentlemen, you are not to consider that remark.
"[PROSECUTOR]: Let me respond —
 "[DEFENSE COUNSEL]: Your Honor, I move for a mistrial.
"THE COURT: Denied.
". . . .
 ". . . [H]ave you ever had a loved one, . . . pass away and you sat in the room and watched? [Defense counsel] talked about he spoke for life; I watched my eighty-four year old father die —
 "[DEFENSE COUNSEL]: Your Honor, I object to that. [The prosecutor] is now introducing facts not in evidence. His statement about his father's death —
"THE COURT: Sustained.
"[DEFENSE COUNSEL]: And, I ask for an instruction.
 "THE COURT: Ladies and Gentlemen, you are not to consider that last remark.
"[DEFENSE COUNSEL]: I move for a mistrial.
"THE COURT: Mistrial denied."
(R. 1413, 1420.)
 "`[A] mistrial is a drastic remedy, to be used only sparingly and only to prevent manifest injustice.' Ex parte Thomas, 625 So.2d 1156, 1157 (Ala. 1993). A mistrial is an extreme measure that should be taken only when the prejudice cannot be eradicated by instructions or other curative actions of the trial court. Nix v. State, 370 So.2d 1115, 1117
(Ala.Crim.App.), cert. denied, 370 So.2d 1119 *Page 153 
(Ala. 1979). If an error can be effectively cured by an instruction, a mistrial is too drastic a remedy and is properly denied. Thompson v. State, 503 So.2d 871, 877 (Ala.Crim.App. 1986)."
Ex parte Lawrence, 776 So.2d 50, 55 (Ala. 2000). "There is a prima facie presumption against error when the trial court immediately charges the jury to disregard improper remarks or answers." Garrett v. State, 580 So.2d 58, 59 (Ala.Crim.App. 1991).
 "`The general rule is that prejudicial statements, even though improper, are considered capable of being eradicated by the trial court in sustaining objections thereto or by appropriate instructions to the jury or both. Meredith v. State, 370 So.2d 1075
(Ala.Crim.App.), cert. denied, 370 So.2d 1079 (Ala. 1979).' Bui v. State, 551 So.2d 1094
(Ala.Crim.App. 1988).
 "Thus, even if the prosecutor's argument, which is quoted above, was improper, any prejudice which may have resulted from this remark was eradicated by the trial court's instruction to the jury to disregard this argument. The motion for mistrial was correctly denied. See Shadle v. State, 280 Ala. 379, 194 So.2d 538 (Ala. 1967)."
Holladay v. State, 549 So.2d 122, 131 (Ala.Crim.App. 1988), aff'd, 549 So.2d 135 (Ala. 1989).
In this case, in each instance about which the appellant complains, the trial court immediately sustained the appellant's objection and instructed the jury to disregard the prosecutor's comment or argument. Contrary to the appellant's contention, we conclude that the trial court's prompt action in sustaining the appellant's objections and in giving curative instructions eradicated any prejudice to the appellant. Therefore, the trial court properly denied the appellant's motions for a mistrial.
 V.
The appellant's fifth argument is that the trial court improperly denied his motion for a change of venue.
 "`A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court's ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130
(Ala.Cr.App. 1983).'
 "Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App. 1994)."
Clemons v. State, 720 So.2d 961, 977 (Ala.Crim.App. 1996), aff'd, 720 So.2d 985 (Ala. 1998). "The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather, Ex parte Grayson[, 479 So.2d 76
(Ala. 1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity." Slagle v. State, 606 So.2d 193, 195
(Ala.Crim.App. 1992). "`Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial.'"Whisenhant v. State, 555 So.2d 219, 224 (Ala.Crim.App. 1988), aff'd, 555 So.2d 235 (Ala. 1989) (quoting Dannelly v. State, 47 Ala.App. 363, 254 So.2d 434 (Ala.Crim.App. 1971)).
 "In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated `actual prejudice' against him on the part of the jurors; 2) *Page 154 
when there is `presumed prejudice' resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th. Cir. 1983)."
Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Crim.App. 1993), aff'd, 642 So.2d 1060 (Ala. 1994).
 A.
We must first determine whether the pretrial publicity resulted in "presumptive prejudice." For prejudice to be presumed under this standard, the defendant must show: 1) that the pretrial publicity was prejudicial and inflammatory and 2) that the prejudicial pretrial publicity saturated the community where the trial was held. See Coleman v. Kemp, 778 F.2d 1487 (11th Cir. 1985). Under this standard, a defendant carries an extremely heavy burden of proof.
 "Hunt relies on the `presumed prejudice' standard announced in Rideau, and applied by the United States Supreme Court in Estes and Sheppard [v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600
(1966)]. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir. 1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: `Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.' 778 F.2d at 1490 (emphasis added [in Hunt]). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App. 1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
 "In determining whether the `presumed prejudice' standard exists the trial court should look at `the totality of the surrounding facts.' Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847
(1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is `rarely' applicable, and is reserved for only `extreme situations'. Coleman v. Kemp, 778 F.2d at 1537. `In fact, our research has uncovered only a very few . . . cases in which relief was granted on the basis of presumed prejudice.' Coleman v. Kemp, 778 F.2d at 1490.
 "Hunt had the burden of showing that `prejudicial pretrial publicity' saturated the community. Sheppard, supra. `[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.' Coleman v. Kemp, 778 F.2d at 1537. `Prejudicial' publicity usually must consist of much more than stating the charge, and of reportage of the pretrial and trial processes. `Publicity' and `prejudice' are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.
". . . .
 ". . . In order to meet the burden of showing the necessity for a change of venue due to pretrial publicity on the grounds of community saturation, `the appellant must show more than the fact "that a case generates even widespread *Page 155 
publicity."' Oryang v. State, 642 So.2d 979, 983
(Ala.Cr.App. 1993), quoting, Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App. 1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
 "`"Newspaper articles alone would not necessitate a change in venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945]."'
 "Thompson, 581 So.2d at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala.Cr.App.), cert. denied, 353 So.2d 35 (Ala. 1977).
 "A review of the media coverage contained in the record on appeal demonstrates that the majority of print media coverage was reasonably factual and more or less objective. We find that the reportage by the news media did not result in the community being so `pervasively saturated' with prejudicial publicity so as to make the court proceedings nothing more than a `hollow formality.' Rideau, supra."
Hunt, 642 So.2d at 1043-44. "To justify a presumption of prejudice under this standard, the publicity must be both extensive and sensational in nature. If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice." UnitedStates v. Angiulo, 897 F.2d 1169, 1181 (1st Cir. 1990).
In support of his motion for a change of venue, the appellant introduced newspaper articles from local newspapers and portions of newscasts by local television stations that covered the case from its inception through the trial, including information as to the area covered by the media. We have examined the materials the appellant presented to the trial court. Based on that review, we find that the reports were factual and relatively objective and not accusatory, inflammatory, or sensational. Therefore, we conclude that the materials did not contain prejudicial information. Further, the appellant did not prove that the media attention inflamed or saturated the community so that there was an emotional tide against him. Accordingly, he has not shown that the pretrial publicity in this case was so inherently or presumptively prejudicial as to constitute one of those "extreme situations" that warrant a presumption of prejudice based on pretrial publicity.
 B.
We must also determine whether the jury was actually prejudiced against the appellant.
 "The `actual prejudice' standard is defined as follows:
 "`To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961)]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and "render[ed] a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643
[6 L.Ed.2d at 756].'
"Coleman v. Zant, 708 F.2d at 544."
Hunt, 642 So.2d at 1043.
 "Furthermore, in order for a defendant to show prejudice, the `"proper manner *Page 156 
for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination." Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App. 1978).' Ex parte Grayson, 479 So.2d 76, 80 (Ala. 1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985)."
Oryang v. State, 642 So.2d 979, 983 (Ala.Crim.App. 1993).
The appellant has not shown that the pretrial publicity actually prejudiced him. Although the jury selection proceedings showed that many of the veniremembers were familiar with the offense, the veniremembers all indicated that they could set aside any knowledge and render a fair verdict based solely on the evidence presented during the trial. Also, the trial court excused for cause several of the veniremembers who had more extensive knowledge about the case. Finally, when it denied the appellant's motion for a change of venue, the trial court stated:
 "[T]here was Individual Voir Dire and both sides were able to question those Jurors extensively concerning their knowledge of the facts. Some had very little knowledge other than to know this case was set. Others who did have some knowledge were struck for cause when you made the motion. And, you have failed to prove actual prejudice and the Motion to Change Venue is denied."
(R. 482.) Accordingly, the appellant has not shown that any of the jurors were actually prejudiced against him.
For these reasons, the appellant did not show that the jurors were either presumptively or actually prejudiced against him. Therefore, the trial court did not abuse its discretion in denying the appellant's motion for a change of venue.
 VI.
The appellant's sixth argument is that the trial court improperly denied his motion for fully sequestered individual voir dire examination of veniremembers.
 "A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882
(1973); Lane v. State, 644 So.2d 1318 (Ala.Cr.App. 1994); Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), affirmed, 632 So.2d 543 (Ala. 1993), affirmed, [513] U.S. [504], 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). After reviewing the record, we conclude that the trial court did not abuse its discretion in this regard."
Ex parte Land, 678 So.2d 224, 242 (Ala. 1996). Furthermore, we addressed a similar claim in Haney v. State, 603 So.2d 368
(Ala.Crim.App. 1991), aff'd, 603 So.2d 412 (Ala. 1992), as follows:
 "Appellant contends that the trial court erred in failing to grant individually sequestered voir dire of the jury venire. The trial court did permit individual voir dire in several instances but otherwise the jurors were questioned by panels. As a general rule, the decision whether to voir dire prospective jurors individually or collectively is within the sound discretion of the trial court. Waldrop v. State, 462 So.2d 1021 (Ala.Cr.App. 1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3483, 87 L.Ed.2d 618 (1988). This discretion is limited, however, by the requirements of due process. United States v. Hawkins, 658 F.2d 279 (5th Cir. 1981); Waldrop v. State. Individual questioning may be necessary under some circumstances to ensure that all prejudice has been exposed. United *Page 157 States v. Hurley, 746 F.2d 725 (11th Cir. 1984). We have reviewed the record of the voir dire examinations and the entire jury selection procedure in this case and find that the method of empaneling the jury provided reasonable assurance that prejudice would have been discovered if present. We find no abuse of discretion in the trial court's handling of the empaneling of this jury."
603 So.2d at 402. "Even in capital cases, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination." Hallford v. State,548 So.2d 526, 538 (Ala.Crim.App. 1988), aff'd, 548 So.2d 547
(Ala. 1989). See also Taylor v. State, 666 So.2d 36
(Ala.Crim.App.), opinion extended after remand, 666 So.2d 71
(Ala.Crim.App. 1994), aff'd, 666 So.2d 73 (Ala. 1995).
We have reviewed the transcript of the voir dire proceedings, and we are satisfied that the method of the examination and the empaneling of the jury "provided reasonable assurance that prejudice would have been discovered if present." Haney, supra. In this case, the trial court allowed the parties to use a questionnaire in connection with the jury selection proceedings. Afterward, the trial court questioned the veniremembers as a group and then allowed the parties to conduct any further voir dire examination. In fact, both the prosecution and defense conducted extensive voir dire examination. Furthermore, the trial court allowed the parties to conduct individual questioning when needed. There is not any indication that the appellant was prejudiced by the way the trial court conducted the voir dire examination. Therefore, the trial court did not err in denying the appellant's motion for fully sequestered individual voir dire examination.
 VII.
The appellant's seventh argument is that the trial court and the district attorney improperly read the indictment to the jury and improperly informed the jury that the district attorney had signed the indictment. Specifically, he contends that these actions emphasized that another group had reviewed the evidence and found the appellant guilty; bolstered the jury's perception of the district attorney; implied that the district attorney had special knowledge of the case that the jury lacked; relieved the jury of its responsibility of determining guilt or innocence; and implied that the district attorney believed that the appellant was guilty. However, the appellant did not raise these arguments at trial. Therefore, we review them for plain error. See Rule 45A, Ala. R.App. P.
During its initial instructions to the jury, the trial court stated:
 "Ladies and Gentlemen, let me begin by reading the Indictment in this case. The reason I read this Indictment to you is because I need to ask you a few questions concerning the Indictment and for no other reason. The Indictment in this case is not any evidence in this case. The Defendant is presumed to be innocent of this charge. The only reason, as I said, that I read it to you is I have to ask you several things concerning the Indictment. It is not to be considered by you as any evidence, just merely the formal means or method by which charges are brought against the Defendant and he is placed on trial before you."
(R. 177.) Afterward, the trial court asked whether any of the veniremembers served on the grand jury that returned the indictment and whether any of the veniremembers knew anything about the facts of *Page 158 
the case. Subsequently, during his voir dire questioning, the prosecutor stated:
 "I want to read the Indictment; it is just words, but it contains the elements that we will be required to prove beyond a reasonable doubt, if I could, very briefly. It says. . . ."
(R. 396.) Finally, during its oral charge, the trial court stated:
 "Now, you will recall, I know it seems a long time ago, but I read the Indictment to you because I needed to ask you a couple of questions concerning the Indictment. I am going to read it to you again; this time for a different reason. Because, you see, the Indictment contains the elements of the offense of Capital Murder. You see, every offense made a crime by the laws of the State of Alabama are comprised of elements. It is the State's burden to prove to you each and every element of the offense beyond a reasonable doubt. This Indictment contains those elements and I want to now read it to you. The Indictment reads as follows: . . . ."
(R. 1208-09.)
We addressed a similar situation in Broadnax v. State,825 So.2d 134, 163-64 (Ala.Crim.App. 2000), aff'd, 825 So.2d 233
(Ala. 2001), as follows:
 "Broadnax contends that the trial court erred in allowing the indictment to be read before the jury [and] in informing the jury that the district attorney had signed the indictment. . . . (Issue XIV in Broadnax's brief to this Court.) He argues that each of these events prejudiced him before the jury.
 "Initially, we note that Broadnax did not object to any of the instances where the state read the indictment to the jury [or] when the trial court informed the jury that the indictment had been signed by the district attorney. . . . Therefore, because he did not properly preserve these contentions, we are limited to reviewing this issue for plain error. Rule 45A, Ala. R.App. P.
 "In Boyd v. State, [715 So.2d 825 (Ala.Crim.App. 1997)], we addressed this same issue, stating:
 "`[T]he district attorney's noting in reading the indictment to the jury, that it was signed by him, is not an injection of his personal belief or otherwise improper. Similarly, in Arthur v. State, 711 So.2d 1031 (Ala.Cr.App. 1996), the appellant argued that the prosecutor improperly inserted his credibility in an attempt to bolster the possibility of conviction by stating that the indictment had been signed by him in his capacity as district attorney. This Court stated:
 "`"Despite the appellant's argument to the contrary, there was no implication by the prosecutor in this case that he believed the appellant to be guilty and, therefore, was prosecuting the case. The jury was amply instructed that an indictment is not an indication of guilt but rather a vehicle for bringing an individual to trial and the prosecutor's acknowledgment that he signed the indictment in his capacity as district attorney was a statement of fact rather than an opinion or insertion of credibility."
"`Arthur, 711 So.2d at 1054.'
"715 So.2d at 841-42.
 "The record reveals that the trial court first read the indictment to the potential jurors before the attorneys conducted voir dire in an attempt to see if any potential jurors had any prior knowledge of the matters alleged in the indictment. (R. Vol. III at 16.) When the trial court concluded reading the indictment aloud, it stated that the document *Page 159 
was signed by the district attorney. (R. Vol. III at 18.) We conclude that as was the case in Boyd, the reading of the indictment and the notation that the district attorney had signed the document were both narrated to the jury as statements of fact. We, therefore, reject Broadnax's claims of error."
In this case, the trial court initially read the indictment to the veniremembers to determine whether any of them had served on the grand jury that returned the indictment and whether any of them knew about the case. In doing so, it instructed the veniremembers that the indictment was not evidence, that the appellant was presumed to be innocent, and that the indictment was simply the instrument for bringing the charge against the appellant. Subsequently, when they read the indictment to the jury, both the trial court and the prosecutor explained that their reason for doing so was because the indictment included the elements of the offense which the State was required to prove to the jury beyond a reasonable doubt. As we did in Broadnax andBoyd, we conclude that the reading of the indictment and notation of the district attorney's signature were properly explained to the jury as statements of fact. In light of the trial court's thorough instructions and the district attorney's explanatory comments, we further conclude that there were not any implications that another group had found the appellant guilty, that the district attorney had special knowledge that the jury lacked, that the jury was relieved of its responsibility of determining guilt or innocence, or that the district attorney believed that the appellant was guilty. Accordingly, we do not find that there was any error, much less plain error, in this regard.
 VIII.
The appellant's eighth argument is that the cumulative effect of the above errors entitles him to a new trial. We have considered each of the allegations of error individually, and we have not found that any of those allegations of error require reversal. We have also considered the allegations of error cumulatively, and we do not find that "the accumulated errors have `probably injuriously affected [the appellant's] substantial rights.'" Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala. 2001) (quoting Rule 45, Ala. R.App. P.). Therefore, the appellant's argument is without merit.
 IX.
For the above-stated reasons, we affirm the appellant's conviction. However, our review of the record indicates that the trial court's written sentencing order in this case does not comply with the requirements of § 13A-5-47(d), Ala. Code 1975, which provides, in pertinent part:
 "Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52."
In its sentencing order, the trial court did not make specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala. Code 1975;[1] the existence or nonexistence of each mitigating *Page 160 
circumstance enumerated in § 13A-5-51, Ala. Code 1975;[2]
and the existence or nonexistence of any additional, nonstatutory mitigating circumstances offered pursuant to § 13A-5-52, Ala. Code 1975.[3]
Therefore, we remand this case with instructions that the trial court amend its sentencing order to comply with the requirements of § 13A-5-47(d), Ala. Code 1975, Ex parte Kyzer, and Ex parteBurgess. If necessary, the trial court may reweigh the aggravating circumstances and the mitigating circumstances and resentence the appellant. On remand, the trial court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time and within 42 days after the release of this opinion.
REMANDED WITH INSTRUCTIONS.
McMILLAN, P.J., and COBB, SHAW, and WISE, JJ., concur.
 On Return to Remand
BASCHAB, Judge.
The appellant, James Earl Walker, was convicted of capital murder for the killing of Bessie Lee Thweatt. The murder was made capital because the appellant committed it during the course of a first-degree burglary. See § 13A-5-40(a)(4), Ala. Code 1975. The jury unanimously recommended that he be sentenced to death. The trial court accepted the jury's recommendation and sentenced the appellant to *Page 161 
death. The appellant filed a motion for a new trial, which the trial court denied after conducting a hearing. The appellant appealed his conviction and sentence to this court.
On October 1, 2004, this court affirmed the appellant's conviction. However, we remanded the case with instructions that the trial court amend its sentencing order to comply with the requirements of § 13A-5-47(d), Ala. Code 1975; Ex parte Kyzer,399 So.2d 330 (Ala. 1981); and Ex parte Burgess, 811 So.2d 617
(Ala. 2000). On November 10, 2004, and on December 8, 2004, the trial court submitted its amended sentencing orders on return to remand, in compliance with our instructions.
Pursuant to § 13A-5-53, Ala. Code 1975, we are required to address the propriety of the appellant's conviction and sentence of death. The appellant was indicted for and convicted of capital murder because he committed the murder during the course of a first-degree burglary. See § 13A-5-40(a)(4), Ala. Code 1975.
The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala. Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. It found that the State proved two aggravating circumstances — 1) the appellant committed the capital offense while he was engaged in the commission of a first-degree burglary, see § 13A-5-49(4), Ala. Code 1975, and 2) the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, see § 13A-5-49(8), Ala. Code 1975. The trial court found that three statutory mitigating circumstances existed — 1) the appellant did not have a significant history of prior criminal activity, see §13A-5-51(1), Ala. Code 1975; 2) the appellant acted under the domination of another person, see § 13A-5-51(5), Ala. Code 1975; and 3) the appellant was 20 years old at the time of the offense,see § 13A-5-51(7), Ala. Code 1975. It also made the following findings as to nonstatutory mitigating circumstances:
 "The Defendant was reared in a single parent home with little relationship with his father. His mother was rarely home. When the mother was home she would bring different men with her. Defendant Walker often saw his mother being beaten by different men. His mother was married five to seven different times. He had an uncle who would mistreat him. Walker was also diagnosed with a brain tumor wrapped around his brain stem, according to his sister. Defendant was a good father to his daughter and a loving father. His daughter loved him.
 "There were altercations between co-defendant Beckworth and Walker. Beckworth was larger and more dominant. The Defendant gave a confession and showed law enforcement officers the crime scene."
(C.R. 354.) The sentencing order and the amended sentencing orders show that the trial court weighed the aggravating and mitigating circumstances and correctly sentenced the appellant to death. The record supports its decision, and we agree with its findings.
Section 13A-5-53(b)(2), Ala. Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant's sentence of death. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
As required by § 13A-5-53(b)(3), Ala. Code 1975, we must determine whether *Page 162 
the appellant's sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. The appellant killed the victim while he was engaged in the commission of a burglary. Similar crimes are being punished by death throughout this state. See Wynn v. State, 804 So.2d 1122 (Ala.Crim.App. 2000); White v. State, 587 So.2d 1218 (Ala.Crim.App. 1990), aff'd, 587 So.2d 1236 (Ala. 1991); Thomas v. State,539 So.2d 375 (Ala.Crim.App.), aff'd, 539 So.2d 399 (Ala. 1988). Therefore, we find that the sentence was neither disproportionate nor excessive.
Finally, we have searched the entire record for any error that may have adversely affected the appellant's substantial rights, and we have not found any. See Rule 45A, Ala. R.App. P.
Accordingly, we affirm the appellant's sentence.
AFFIRMED.
McMILLAN, P.J., and COBB, SHAW, and WISE, JJ., concur.
[1] In its order, the trial court found that there were two aggravating circumstances — 1) the appellant committed the offense while he was engaged in the commission of a first-degree burglary, see § 13A-5-49(4), Ala. Code 1975, and 2) the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, see § 13A-5-49(8), Ala. Code 1975. Although the evidence appears to support a finding that the offense was especially heinous, atrocious, or cruel compared to other capital offenses, we question whether the trial court's findings concerning the prolonged suffering, pain, and torture inflicted on the victim are specific enough to comply with Exparte Kyzer, 399 So.2d 330 (Ala. 1981). Also, the trial court did not make specific findings as to the existence or nonexistence of the remaining aggravating circumstances set forth in § 13A-5-49, Ala. Code 1975. See Turner v. State,924 So.2d 737 (Ala.Crim.App. 2002).
[2] In its order, the trial court addressed each of the statutory mitigating circumstances set forth in § 13A-5-51, Ala. Code 1975. However, it did not specifically state, and it is not clear from the order, whether it determined that those statutory mitigating circumstances did or did not exist. In addition, with regard to the mitigating circumstance that the appellant does not have a significant history of prior criminal activity, see § 13A-5-51(1), Ala. Code 1975, we specifically note that the trial court makes references to the appellant's prior youthful offender adjudications. However, as the Alabama Supreme Court held in Ex parte Burgess, 811 So.2d 617, 624
(Ala. 2000):
 "[A] trial court may consider a defendant's juvenile adjudications to be a relevant consideration in deciding what weight to assign to the statutory mitigating circumstances of a defendant's lack of a significant prior criminal history and a defendant's age at the time of the offense. . . . In other words, during the sentencing process in a capital case, the trial court may use a defendant's juvenile record to diminish the weight to be accorded the mitigating circumstance of that defendant's lack of a significant history of prior criminal activity, as well as the mitigating circumstance of that defendant's age at the time he or she committed the capital offense, but the trial court may not use the juvenile record as the basis for giving little or no weight to such mitigating circumstances."
(Emphasis added.)
[3] In its order, the trial court stated that it would "address other mitigating circumstances alleged at trial," and it did list some other mitigating circumstances. (C.R. 354.) However, it did not specifically state whether it determined that those nonstatutory mitigating circumstances did or did not exist.