[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1158 
Antonio Devoe Jones was convicted of one count of murder made capital in connection with the death of Ruth Kirkland because it was committed during the course of a burglary in the first degree. See § 13A-5-40(a)(4), Ala. Code 1975. The jury recommended, by a vote of 11 to 1, that Jones be sentenced to death. The trial court accepted the jury's recommendation and sentenced Jones to death.
The State's evidence tended to show that on the afternoon of December 31, 1999, 80-year-old Ruth Kirkland drove her 1990 white Cadillac automobile to the grocery store to purchase groceries. Mrs. Kirkland, who had lived alone since the death of her husband, was a petite woman, who had suffered a stroke, leaving her with a limp and a weak right arm. As a result of the stroke, Mrs. Kirkland used a walker or a cane to get around. It was generally known in the community that Mrs. Kirkland kept money inside her house.
According to testimony at trial, because of her condition, it took Mrs. Kirkland several trips to carry her groceries inside, and it became dark before she got all her groceries into her house. Because Mrs. Kirkland did not like to be outside after dark, she left the remaining groceries in her car for the night.
Some time later, Antonio Jones went to Mrs. Kirkland's house, turned off the circuit breakers outside, and went inside. From the evidence, the police were unable to determine whether Jones broke into the house or whether Mrs. Kirkland opened the door to investigate the power failure, allowing Jones to enter unimpeded.
Upon gaining entry to the house, Jones beat and kicked Mrs. Kirkland as she attempted to defend herself. Jones broke Mrs. Kirkland's wrists as she attempted to ward off his blows. In addition to using his hands and feet to assault Mrs. Kirkland, Jones also used one of Mrs. Kirkland's walking canes and a broken chair leg to savagely beat Mrs. Kirkland. Splatters of Mrs. Kirkland's blood were found in various locations and pieces of her broken cane were found in several different rooms.
At some point, Jones dumped the contents of Mrs. Kirkland's purse on the floor. Mrs. Kirkland kept the keys to her car in her purse. He also searched the house for the money Mrs. Kirkland reportedly kept in her house, ransacking the house, leaving open several drawers and cabinets. Mrs. Kirkland's body was found near the armoire where she kept her money. Jones took Mrs. Kirkland's car keys — and possibly other undetermined items — and left Mrs. Kirkland's house driving her white Cadillac.
That same evening, Linda Parrish, Mrs. Kirkland's daughter, became concerned when she was unable to contact her mother by telephone. Mrs. Parrish asked her son, Brent Parrish — a Dothan police officer — to go by Mrs. Kirkland's house and check on her. Officer Parrish arrived at his grandmother's house shortly before 8:00 p.m. He noticed that no lights were on inside the house and that Mrs. Kirkland's white Cadillac was missing. As he approached *Page 1159 
the house, Officer Parrish discovered that the back door was open. Officer Parrish notified the police and waited for help to arrive. When the other officers arrived, the police entered Mrs. Kirkland's house and discovered her body lying on the floor.
Concluding that Mrs. Kirkland's assailant had taken her automobile, the police began searching for the white Cadillac. Around 9:00 p.m., an officer spotted a white Cadillac matching the description of Mrs. Kirkland's. The officer activated his emergency lights, signaling the driver to stop; however, the driver failed to stop. The officer requested assistance, and several other patrol cars responded. Eventually, the police were able to stop the car near a K-Mart discount department store on the north side of Dothan. Inside the car were Jones; his sister, Lakeisha Jones; Lakeisha's baby; and Lakeisha's boyfriend. Jones, whose clothes and shoes were bloodstained, was taken into custody. During a search of the car, police discovered a number of items, including Mrs. Kirkland's remaining groceries, two of Mrs. Kirkland's walking canes, and a torn and empty envelope from SouthTrust Bank apparently given to Mrs. Kirkland when she made a withdrawal. Neither Lakeisha nor her boyfriend knew anything about Mrs. Kirkland's murder. Lakeisha did, however, tell the police that Jones was acting strangely when he picked them up earlier that evening.
Jones was transported to the Dothan Police Department. At some point, Jones voluntarily stated that he knew where to find bloody clothes related to Mrs. Kirkland's murder. Officer Jon Beeson then informed Jones of his constitutional rights in accordance with Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Jones declined to sign a waiver-of-rights form, but he did agree to accompany police officers to a bridge on Honeysuckle Road where, he claimed, the true killers of Mrs. Kirkland had disposed of their bloody clothing. Before taking Jones to the bridge, officers had him remove the clothes and shoes he was wearing when he was taken into custody. Jones agreed, and he changed clothes. The clothing he had been wearing was taken to the Alabama Department of Forensic Sciences for testing.
Thereafter, the police took Jones to the bridge on Honeysuckle Road, where they unsuccessfully searched for the reported bloody clothing. The officers also searched for footprints in the area and found none. After daylight, the officers returned to the site but again found no evidence that would support Jones's claims.
Back at the police station, Jones asked to speak to Officer Beeson again. Before talking with Jones, Beeson informed Jones of his Miranda rights a second time. At 2:55 a.m. on January 1, 2000, Jones signed a waiver-of-rights form, acknowledging that he understood his rights and that he had not been threatened or promised anything in exchange for his statement. Jones told Beeson that three other men had killed Mrs. Kirkland.[1] Jones denied any involvement in Mrs. Kirkland's killing; he claimed that he was not present when Mrs. Kirkland was killed and that the blood on his clothes came from being around the three killers. Additionally, Jones claimed that the white Cadillac he was driving belonged to his grandfather.[2] *Page 1160 
Around 5:30 a.m., Jones asked to speak with Officer Beeson again, stating that he wanted to tell Beeson the "whole story." Sgt. Jim Stanley told Jones that Beeson was unavailable, and Jones indicated that he wished to tell Stanley "the rest of the story." Sgt. Stanley took Jones into his office, where they were joined by Officer Donovan Kilpatrick. Before allowing Jones to give his statement, Sgt. Stanley asked Jones if he remembered his Miranda rights. Jones indicated that he did. Jones proceeded to give the officers additional information regarding Mrs. Kirkland's murder. As Jones related his version of events, Sgt. Stanley made notes of what Jones told them. During Jones's second statement, he admitted being present at Mrs. Kirkland's house during the murder. Jones claimed, however, that the other three men had entered the house with the intent to commit a robbery. He claimed that when he entered Mrs. Kirkland's house, one of the three men was beating her with a walking cane. According to Jones, he took the cane away from Mrs. Kirkland's assailant and telephoned 911 for emergency assistance in an attempt to save Mrs. Kirkland. Jones also claimed that the other three men took Mrs. Kirkland's car. He claimed that after he telephoned for assistance and turned the circuit breakers back on, he became scared and fled the scene on foot. Only later, Jones claimed, did he meet up with the other three who at that time were driving Mrs. Kirkland's car. When the officers attempted to verify Jones's claims, they discovered that the three men Jones claimed had killed Mrs. Kirkland all had alibis. Likewise, no 911 emergency calls had been received from Mrs. Kirkland's home that night.
On January 2, 2000, Dr. Alfredo Paredes, a forensic pathologist with the Alabama Department of Forensic Sciences, conducted a postmortem examination on Mrs. Kirkland's body. Dr. Paredes determined that the cause of Mrs. Kirkland's death was blunt-force trauma incurred during the attack. Based on his examination, Dr. Paredes concluded that Mrs. Kirkland's assailant had used his hands and/or fists, and that he had also beaten her with a walking cane and a broken chair leg. Additionally, the assailant kicked Mrs. Kirkland and "stomped" on her breasts. The blows caused over 100 separate injuries to Mrs. Kirkland's body, including severe bleeding, multiple blows to her head and face, and multiple fractures to her ribs, sternum, and arms.
The Alabama Department of Forensic Sciences also conducted DNA testing on the clothing Jones was wearing when he was taken into custody. DNA testing positively matched Mrs. Kirkland's DNA to the blood found on Jones's clothing.
At trial, Jones offered two witnesses — Malik Ali Hasan and Palmer Cox — in an effort to prove either that he was not at Mrs. Kirkland's house on the night of the incident or that someone else had committed the murder. At the time of their testimony, both witnesses were incarcerated for offenses unrelated to this case.
After both sides had rested and the trial court instructed the jury on the applicable law, the jury returned a verdict finding Jones guilty of capital murder as charged in the indictment.
During the penalty phase of Jones's trial, the State resubmitted all of the evidence it had introduced during the guilt phase. The State did, however, recall Dr. Alfredo Paredes to testify briefly concerning the extent of Mrs. Kirkland's injuries and whether she was conscious during her *Page 1161 
attack. Dr. Paredes testified that based on the massive bleeding and the numerous defensive injuries, he believed that Mrs. Kirkland was conscious during much of the attack.
Jones offered the testimony of several witnesses during the penalty phase. Jill Witsett, Jones's mother, testified that Jones was raised in a single-parent home and that he had no relationship with his father. She testified that the family did not have a lot of money and, on occasion, received welfare and food stamps. Witsett testified that as a child Jones was diagnosed with hyperactivity; numerous medications were prescribed to treat his condition. According to Witsett, when Jones took his medication, he was much calmer. Jones's aunt, Marilyn Walker, and his sister, Lakeisha Jones, also testified. Both women testified concerning the difficult circumstances of Jones's youth.
Edwina Culp, a GED instructor at the Alfred Saliba Family Services Center in Dothan, testified that Jones had attended GED classes at the Saliba Center. She testified that while attending classes, Jones's progress fluctuated. She testified that an individual's home environment could cause fluctuations in a student's progress. According to Ms. Culp, Jones "was not a troublemaker" in class; "he cooperated with me when I would ask him to do something to the best of his ability." (R. 1379.)
Finally, Jones offered the testimony of Dr. Robert deFrancisco, a clinical forensic psychologist. Dr. deFrancisco testified that he had met with Jones on several occasions after the incident in order to evaluate his mental condition. Dr. deFrancisco determined that Jones's IQ was 81, which was "below average." Dr. deFrancisco described Jones as a "gap child," meaning "someone who doesn't fit into the school system . . . he's too smart to be in special ed, but he's too slow to be in a regular class." (R. 1432.) Dr. deFrancisco testified that as a gap child falls behind his chronological peers, "the individual becomes more and more frustrated, and . . . tend[s] to have a lot of behavior problems." (R. 1433.) According to Dr. deFrancisco:
 "Under the right guidance and instruction, [Jones] can be a productive person. He is not stupid. He is not mentally retarded. And he is not crazy. He's totally misguided. And he has suffered from a horrible, horrible childhood. And I'm not justifying anything he's done. I'm explaining to you the fact that behavior does not occur in a vacuum. You just can't look at an act. You have to understand the individual."
(R. 1438.)
After both sides had rested and the trial court instructed the jury on the law applicable to the penalty phase, the jury returned an advisory verdict recommending that Jones be sentenced to death.
 Standard of Review
In every case in which the death penalty is imposed, this Court must review the record for any plain error, i.e., for any defect in the proceedings, whether or not the defect was brought to the attention of the trial court. Rule 45A, Ala.R.App.P., provides:
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant." *Page 1162 
As this Court stated in Hall v. State, 820 So.2d 113,121-22 (Ala.Crim.App. 1999), aff'd, 820 So.2d 152 (Ala. 2001):
 "The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1
(1985), the plain-error doctrine applies only if the error is `particularly egregious' and if it `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742
(Ala.Cr.App. 1997), aff'd, 723 So.2d 770 (Ala. 1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App. 1992), rev'd on other grounds, 620 So.2d 709 (Ala. 1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993)."
Although Jones's failure to object at trial will not preclude this Court's review of an issue in this case, it will, nevertheless, weigh against any claim of prejudice he makes on appeal. See Dill v. State, 600 So.2d 343
(Ala.Crim.App. 1991), aff'd, 600 So.2d 372 (Ala. 1992).
 Guilt-Phase Issues I.
Jones argues that the trial court erred in denying his motion to suppress and in admitting into evidence the statements he gave to law-enforcement officials on January 1, 2000. Specifically, he claims that although his statements were "ostensibly made voluntarily and at Mr. Jones's instigation," they were made as a result of the "coercive effect of the threat of the electric chair." (Appellant's brief at 62.)
An examination of the record indicates that Jones made three statements following his apprehension. The first statement involved Jones's spontaneous offer to show law-enforcement officials where "the real killers" had disposed of their clothing — at a bridge on Honeysuckle Road. Jones was advised of his Miranda rights following this spontaneous statement, but he declined to sign a waiver-of-rights form.
After an unsuccessful search by law-enforcement officials at the Honeysuckle Road bridge location, Jones was returned to the Dothan Police Department, where he was advised of hisMiranda rights a second time. Jones executed a waiver-of-rights form at 2:55 a.m. on January 1, 2000, and was interviewed by Officer Jon Beeson. During the lengthy interview, Jones expounded on his initial claim that Mrs. Kirkland was killed by three other men. When Beeson pointed out inconsistencies in Jones's claims and accused him of lying, Jones apparently realized the seriousness of the charges he faced, stating: "Oh, oh oh sir. This here. I'll go m _____ f ______ to the electric chair." (Suppression hearing, Defendant's exhibit 1, p. 89.) Several moments later, when Officer Beeson questioned Jones about how he got blood on his clothes and shoes if he was not involved in Mrs. Kirkland's killing, Jones angrily denied any involvement and asked why he would want to kill someone else's mother or grandmother after he had watched someone shoot and kill his own grandmother. Jones continued to deny any involvement in the killing, stating that he did not want to kill anybody.
 "A.J. [Jones]: . . . I'm too smart . . . to kill some m ______ f _____ body. I don't kill no nigger.
 "J.B. [Beeson]: You want to kill me right now, don't you. *Page 1163 
 "A.J.: No, I'm I was trying to say so I can go home.
 "J.B.: I can see it in your eyes, you hate my guts.
 "A.J.: No sir, I don't hate you, cause like they say . . . I ain't gonna hate, cause you ain't done s___ to me. What the f___ you did to me?
 "J.B.: Nothing. I'm sitting here holding your life in my hands.
 "A.J.: Oh, sir.
 "J.B.: That and the electric chair.
 "A.J.: Oh, sir. Like I, like I just said sir, like I just [said] sir. . . .
 "J.B.: Hit that woman in the head, that blood splatters and it gets all over your shoes.
 "A.J.: Check my hands, do anything sir. I'm — I'm telling you like this, like this sir. Now, I watched my m_____ f_____ grandma die in my m_____ f _____ face. I watched her die."
(Suppression hearing, Defendant's exhibit 1, p. 91.)
After this exchange the interview continued, with Jones continuing to deny any involvement in Mrs. Kirkland's killing. Nothing more was said by either Beeson or Jones regarding the electric chair or a possible death sentence during the rest of the interview. Although defense counsel questioned Beeson about this statement during the suppression hearing, it does not appear that this statement was the subject of the suppression hearing, nor was it ever introduced into evidence during the State's case-in-chief. However, the statement was referenced during the State's rebuttal case.[3]
Around 5:30 a.m., Jones indicated a desire to speak with Officer Beeson again, stating that he wanted to tell the "whole story." When Sgt. Jim Stanley told Jones that Officer Beeson was no longer available, Jones indicated that he wanted to tell Stanley what had happened. Sgt. Stanley took Jones into his office, where they were joined by Officer Kilpatrick. Before allowing Jones to make any statement, Stanley reminded Jones of his Miranda rights. Jones then admitted for the first time that he had been present in Mrs. Kirkpatrick's house. However, Jones continued to maintain that the three other men had killed Mrs. Kirkpatrick and that he had tried to call for assistance. At the suppression hearing, Jones claimed that anything he said in the third statement should have been excluded because it was made after Officer Beeson threatened him with the possibility of the electric chair if he did not cooperate. The trial court denied Jones's motion to suppress the statement he made to Sgt. Stanley.
It has long been the law that a confession is prima facie involuntary and inadmissible and that, before a confession may be admitted into evidence, the burden is upon the State to establish voluntariness and a Miranda predicate.Jackson v. State, 562 So.2d 1373, 1380
(Ala.Crim.App. 1990). A two-pronged test is used to determine whether an accused's statement is *Page 1164 
admissible. First, the trial court must determine whether the accused was informed of his Miranda rights before he made the statement. Second, the trial court must determine whether the accused voluntarily and knowingly waived hisMiranda rights before making his statement. Holderv. State, 584 So.2d 872, 878 (Ala.Crim.App. 1991);Carpenter v. State, 581 So.2d 1277, 1278
(Ala.Crim.App. 1991).
In order for a statement to be admissible, "[t]he trial judge need only be convinced from a preponderance of theevidence to find a confession to have been voluntarily made." Jackson v. State, 516 So.2d 726, 741
(Ala.Crim.App. 1985), citing Harris v. State,420 So.2d 812, 814 (Ala.Crim.App. 1982) (emphasis added). See also Exparte Williams, 627 So.2d 999, 1003 (Ala. 1993). Moreover, in cases involving conflicting evidence on the issue of voluntariness, the trial court's determination is entitled to great weight on appeal. D.M.M. v. State, 647 So.2d 57,60 (Ala.Crim.App. 1994). "`"Where the evidence of voluntariness is conflicting, and even where there is credible testimony to the contrary, the trial judge's finding of voluntariness must be upheld unless palpably contrary to the weight of theevidence."'" Dixon v. State, 588 So.2d 903, 908
(Ala. 1991) (quoting Carr v. State, 545 So.2d 820, 824
(Ala.Crim.App. 1989)) (emphasis added). See also Ex parteJackson, 836 So.2d 979, 982 (Ala. 2002).
If the first prong of the test is met, the court must then determine whether, after having been informed of his rights, the accused made a knowing and voluntary waiver of those rights. Jones's argument appears to be premised on the fact that because Officer Beeson mentioned the possibility that if convicted Jones could be sentenced to death during Jones's second statement, anything said during the third statement, made to Sgt. Stanley, was involuntary and should have been excluded at trial.
Initially, we note that no objection was raised regarding Officer Beeson's rebuttal testimony concerning Jones's second statement until the end of his testimony, at which time defense counsel requested that Beeson's testimony be struck. Because, however, Jones was sentenced to death, we will review the admissibility of the statement under the plain-error standard.
As previously stated, at no point while he was making the second statement did Jones admit any involvement in Mrs. Kirkland's killing. Indeed, Jones claimed that Mrs. Kirkland had been killed by three other men whom he had come into contact with later that evening. Accordingly, Jones's statement was not a compelled confession protected by the Fifth Amendment. "A false statement made by an accused, in an offer to exculpate or divert suspicion from himself or to explain away apparently incriminating circumstances, is provable without regard to the rules governing the admissibility of confessions." 2 Charles W. Gamble, McElroy's AlabamaEvidence § 200.02(4)(c) (5th ed. 1996) (footnote omitted). Further, the State did not offer this statement as evidence of Jones's guilt, but, rather, to rebut his claim that he was with Hasan on the night Mrs. Kirkland was killed. Therefore, because the State did not offer Jones's statement for the purpose of establishing Jones's guilt or to show that Jones otherwise incriminated himself, the State was not obliged to establish that the statement was voluntarily given as a prerequisite for its admission into evidence. See, e.g.,Ringstaff v. State, 451 So.2d 375, 384
(Ala.Crim.App. 1984); McGehee v. State, 171 Ala. 19, 55
So. 159 (1911); Franklin v. State, 145 Ala. 669, 39 So. 979 (1906).
In any event, the trial court properly admitted Jones's statement because it was *Page 1165 
knowingly and voluntarily given. It is clear from the record that Officer Beeson's remark about the electric chair was not intended as a threat to get Jones to confess or otherwise to implicate himself in Mrs. Kirkland's killing. Given that Jones had already mentioned the possibility of the death penalty with no prompting from Beeson convinces us that Officer Beeson's statement about the electric chair did not constitute a threat that coerced Jones into confessing. Likewise, Officer Beeson's statement concerning the electric chair did not constitute an "implied promise of leniency." As the Alabama Supreme Court explained in Ex parte Price,725 So.2d 1063 (Ala. 1998):
 "It is well established that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568
(1897). A court should examine the totality of the circumstances to determine if an implied promise of leniency caused the defendant to make a confession. Ex parte Gaddy, 698 So.2d 1150 (Ala. 1997). The test of involuntariness of a confession, or other inculpatory statement, is whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by the apprehension of harm or hope of favor. McLeod [v. State], supra, 718 So.2d [727,] 729 [(Ala. 1998)]. To determine whether a defendant's will has been overborne, it is necessary to assess `"the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure" [and] "[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures.'" McLeod, 718 So.2d at 730 (quoting an earlier case)."
725 So.2d at 1072-73. See also Jones v. State,946 So.2d 903, 916 (Ala.Crim.App. 2006); Lee v. State,898 So.2d 790, 831 (Ala.Crim.App. 2001) (opinion on return to remand).
In light of the fact that Jones continued to deny any involvement in Mrs. Kirkland's killing after Officer Beeson made the reference regarding the electric chair, his comment cannot be said to have "overborne" Jones's will and forced him into confessing. Because the State offered ample evidence indicating that Jones was informed of his Miranda
rights, chose to waive those rights and voluntarily consented to be interviewed by Officer Beeson, and that Officer Beeson made neither threats nor implied promises of leniency, the trial court correctly determined that Jones's second statement was voluntary and admissible.
Jones also contends that his third statement should have been excluded from evidence as a result of Officer Beeson's comment regarding the electric chair. Given that Officer Beeson's statement did not affect the voluntariness of Jones's second statement, we fail to see how it affected his third statement. The record indicates that sometime after completing his second statement, [4] Jones asked to see Officer Beeson again so that he could tell him the "whole story." Upon learning that *Page 1166 
Officer Beeson was no longer available, Jones indicated that he wished to tell Sgt. Stanley the rest of his story. Sgt. Stanley took Jones into his office, where they were joined by Officer Kilpatrick. Sgt. Stanley asked Jones if he recalled hisMiranda rights, to which Jones replied "yes," and the interview began. Once Miranda warnings have been given, it is unnecessary to repeat the warnings at each successive interview. See Smith v. State,795 So.2d 788, 810 (Ala.Crim.App. 2000), cert. denied, 795 So.2d 842
(Ala. 2001); Woods v. State, 789 So.2d 896, 923
(Ala.Crim.App. 1999), aff'd, 789 So.2d 941 (Ala. 2001). Moreover, it is clear from the record that Jones's third statement was wholly voluntary. As previously determined, Officer Beeson never made any threats or implied promises of leniency that would have overborne Jones's will. Nor is there any evidence that Sgt. Stanley or Officer Kilpatrick made any threats or promises in order to obtain Jones's statement. To the contrary, it is clear that Jones wanted to talk with the officers. It is equally clear that Jones's will was never overborne to the extent that he felt compelled to confess because Jones never admitted killing Mrs. Kirkland. Ex parte Price,725 So.2d at 1072-73. Indeed, Jones's desire to tell the "whole story" was nothing more than another attempt to convince law-enforcement officials of his innocence by attempting to paint himself as Mrs. Kirkland's rescuer rather than her killer. The record indicates that Jones repeatedly lied to law-enforcement officials in order to protect himself from punishment. Thus, Jones's claim that his third statement was the result of coercion is without merit.
Jones was properly advised of his Miranda rights, and none of his statements to law-enforcement officials was the product of either threats or implied promises of leniency. See Holder v. State, supra,584 So.2d at 878. This Court has held that we will not disturb a trial court's decision on a motion to suppress "`"`unless it is manifestly contrary to the great weight of the evidence."'"Whitehead v. State, 777 So.2d 781, 820
(Ala.Crim.App. 1999), aff'd, 777 So.2d 854 (Ala. 2000) (quoting other cases). Based on the totality of the circumstances, the trial court correctly determined that Jones's statements were voluntarily made. Accordingly, the trial court correctly determined that evidence concerning Jones's third statement was admissible at trial.
Moreover, in light of the fact that none of Jones's statements contained an outright confession to killing Mrs. Kirkland, together with the physical evidence connecting him to the offense — Jones was found driving Mrs. Kirkland's car shortly after her body was discovered, wearing clothes stained with Mrs. Kirkland's blood — any error in allowing testimony regarding Jones's statements was harmless beyond a reasonable doubt. See Chapman v. California,386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Thus, no basis for reversal exists as to this claim.
 II.
Jones argues that there was insufficient evidence upon which to sustain his conviction for the capital offense of murdering Mrs. Kirkland during the commission of first-degree burglary. Specifically, Jones contends that the State failed to establish that "theft had occurred pursuant to the burglary of the victim's house, as stated in the indictment." (Appellant's brief at 67.) The gist of Jones's argument is that first-degree burglary, as alleged in the indictment, would require the theft of something from inside Mrs. Kirkland's dwelling. Therefore, he argues, because Mrs. Kirkland's Cadillac was not inside her dwelling and there was no evidence that *Page 1167 
anything was taken from inside the dwelling, the State failed to present a prima facie case of first-degree burglary.
 "`"In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution."' Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App. 1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App. 1984), aff'd, 471 So.2d 493 (Ala, 1985). `"The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt."' Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App. 1997), quoting O'Neal v. State, 602 So.2d 462, 464
(Ala.Crim.App. 1992). `"When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision."' Farrior v. State, 728 So.2d 691, 696
(Ala.Crim.App. 1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App. 1990). `The role of appellate courts is not to say what the facts are. Our role . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.' Ex parte Bankston, 358 So.2d 1040, 1042 (Ala. 1978).
 "The trial court's denial of a motion for judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference could find the defendant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App. 1978). In applying this standard, this court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App. 1983). When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for judgment of acquittal does not constitute error. McConnell v. State, 429 So.2d 662 (Ala.Cr.App. 1983)."
Gavin v. State, 891 So.2d 907, 974
(Ala.Crim.App. 2003), cert. denied, 891 So.2d 998 (Ala. 2004) (quoting Ward v. State, 610 So.2d 1190, 1191
(Ala.Crim.App. 1992)). See also Ward v. State,814 So.2d 899, 908-10 (Ala.Crim.App. 2000), cert. denied,814 So.2d 925 (Ala. 2001).
Section 13A-7-5, Ala. Code 1975, defines the crime of first-degree burglary as follows:
 "(a) A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in dwelling or in immediate flight therefrom, he or another participant in the crime:
 "(1) Is armed with explosives or a deadly weapon; or
 "(2) Causes physical injury to any person who is not a participant in the crime; or
 "(3) Uses or threatens the immediate use of a dangerous instrument."
Based on the plain language of § 13A-7-5, in order to establish a prima facie case of first-degree burglary, the State was required to prove that Jones entered or remained unlawfully in Mrs. Kirkland's house with the intent to commit a crime and that he caused physical injury to any *Page 1168 
person who was not a participant in the crime. Clearly, Jones caused physical injury to Mrs. Kirkland. Thus, we must now determine whether the State presented sufficient evidence that Jones entered Mrs. Kirkland's house with the intent to commit a crime. Contrary to Jones's contention, the law does not require that the crime — in this case, theft — be completed. Rather, the accused must merely unlawfully enter a dwelling with the intent to commit a crime. As the Alabama Supreme Court noted in Ex parte Dixon,804 So.2d 1075, 1079 (Ala. 2000), "Burglary in the first degree does not require that the defendant act during the commission of a theft." Indeed, this Court has long held that `"[t]o constitute burglary, it is not necessary that a theft be actually committed.'" McGullion v. State, 477 So.2d 477, 484
(Ala.Crim.App. 1985) (quoting Houston v. State, 56 Ala.App. 295, 321 So.2d 261, 264 (Ala.Crim.App. 1975)). See alsoCoral v. State, 628 So.2d 954, 965
(Ala.Crim.App. 1992), aff'd, 628 So.2d 1004 (Ala. 1993) ("If the requisite intent were present at the time of entry, the crime of burglary would have been complete regardless of whether the robbery or theft actually occurred."). Accordingly, because the State established that Jones entered Mrs. Kirkland's house with the intent to commit a theft, the State was not required to proffer additional evidence that Jones actually committed the theft by taking something from inside the house.
Based on the evidence, it is readily apparent that Jones entered Mrs. Kirkland's house with the intent to commit a theft. The record indicates that when the police entered Mrs. Kirkland's house, they discovered that her house had been ransacked, leaving several drawers and cabinets open — evidence that Jones was searching for something, in this case, the money that Mrs. Kirkland reportedly kept in her house. Additionally, the contents of Mrs. Kirkland's purse were scattered on the floor — again, evidence that Jones was searching for something. There was additional evidence that Mrs. Kirkland kept her car keys in her purse. From this evidence establishing that Jones searched the areas of Mrs. Kirkland's house where she might keep valuables, it was logical for the jury to conclude that Jones entered Mrs. Kirkland's house with the intent to commit a crime namely, theft. Accordingly, Jones's claim is without merit.
In any event, even if we were to hold that the State was required to prove that Jones had committed a theft inside Mrs. Kirkland's house, there is ample evidence of that fact as well. As previously established, the State presented evidence that Mrs. Kirkland kept her car keys in her purse. Mrs. Kirkland's purse was found inside the house, its contents strewn on the floor. From this evidence, the jury could conclude that Jones stole Mrs. Kirkland's keys while he was inside her house and, once outside, used the stolen keys to take the white Cadillac. Moreover, the State's evidence established that Mrs. Kirkland kept cash in an armoire inside her house — the armoire near where the police found Mrs. Kirkland's lifeless body. Although no cash was found in the armoire, when Jones was apprehended there was a torn and empty bank envelope — the kind used for keeping cash inside — found inside Mrs. Kirkland's car. Again, this was sufficient evidence to present a jury question of whether Jones had stolen money from Mrs. Kirkland's house. Thus, the trial court correctly denied Jones's motions for a judgment of acquittal.
 Penalty-Phase Issues III. Jones argues that the State's evidence failed to establish that Mrs. Kirkland's murder was "especially heinous, atrocious, or cruel compared to other capital *Page 1169 
offenses." See § 13A-5-49(8), Ala. Code 1975. Specifically, Jones argues that because the State could not prove that Mrs. Kirkland was conscious and felt pain throughout the entire beating that resulted in her death, it was not appropriate for the court to find the existence of this aggravating circumstance.
In Barksdale v. State, 788 So.2d 898 (Ala.Crim.App.), cert. denied, 788 So.2d 915 (Ala. 2000), we addressed the application of this aggravating circumstance, stating as follows:
 "In Ex parte Kyzer, 399 So.2d 330, 334
(Ala. 1981), this Court held that the standard applicable to the `especially heinous, atrocious, or cruel' aggravating circumstance under § 13A-5-49(8), Ala. Code 1975, is that the crime must be one of `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' The appellant's assertion that the murder was not unnecessarily torturous to the victim because he did not intentionally inflict prolonged pain upon the victim is without merit. It is not, as the appellant argues, incumbent upon the State to prove that he inflicted savagery or brutality upon the victim, or that he took pleasure in having committed the murder. It is necessary that the State present evidence that the victim suffered some type of physical violence beyond that necessary or sufficient to cause death. Additionally, to support this aggravating factor, the time between at least some of the injurious acts must be an appreciable lapse of time, sufficient enough to cause prolonged suffering, and the victim must be conscious or aware when at least some of the additional or repeated violence is inflicted. See Norris v. State, [793] So.2d [847] (Ala.Cr.App. 1999)."
788 So.2d at 907-08.
We also addressed the application of this aggravating circumstance in Taylor v. State, 808 So.2d 1148
(Ala.Crim.App. 2000), aff'd, 808 So.2d 1215 (Ala. 2001), noting:
 "The Alabama appellate courts' interpretation of `especially heinous, atrocious, or cruel' has passed muster under the Eighth Amendment because those courts have consistently defined the term to include only `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' Ex parte Clark, [728 So.2d 1126 (Ala. 1998)], citing, Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir. 1989). The Alabama appellate courts have considered the infliction of psychological torture as especially indicative that the offense was `especially heinous, atrocious or cruel.' Thus, the mental suffering where a victim witnesses the murder of another and then realizes that soon he or she will also be killed, has been found to be sufficient to support a finding of this aggravating circumstance. Norris v. State, 793 So.2d 847, 854
(Ala.Cr.App. 1999). As the trial judge pointed out in his sentencing order, two of the victims here witnessed Taylor kill another victim. Both tried to run and hide, but were captured. Both begged and pleaded for their lives; one offering money and property, the other pleading for the sake of her children. Both were deliberately and methodically executed with a gunshot to the head as they pleaded for their lives. These murders were not accomplished in a rapid-fire manner; there was sufficient time between the three murders for the next victim to be placed in significant fear for his or her life, and the evidence is clear that each was well aware of what was about to happen."
808 So.2d at 1169.
The evidence presented by the State established that the physical violence inflicted *Page 1170 
on Mrs. Kirkland went far beyond that necessary or sufficient to cause death, that Mrs. Kirkland suffered appreciably during her assault, and that psychological torture was inflicted on Mrs. Kirkland in that her beating lasted for a sufficient period for her to realize her own fate. The beating inflicted by Jones, a healthy young man who stood 6'1" tall and weighed 185 pounds, on Mrs. Kirkland, a petite, partially disabled 80-year-old woman, far exceeded that necessary or sufficient to cause death. Forensic pathologist Dr. Alfredo Paredes testified at length concerning the injuries inflicted on Mrs. Kirkland prior to her death. Dr. Paredes testified that a beating of the type that Jones inflicted on Mrs. Kirkland would have lasted for an "extended period of time," and that she likely suffered extensive physical pain as well as "psychological distress" during the attack. Moreover, evidence of the extensive bleeding caused by the injuries indicated that Mrs. Kirkland was alive when the injuries were inflicted. Dr. Paredes testified that although he could not be absolutely certain that Mrs. Kirkland was conscious throughout the entire attack, the evidence of defensive wounds to her hands, arms, and back indicated that she was conscious for an appreciable portion of the attack and that she attempted to protect herself from further injuries. Dr. Paredes testified that Jones beat Mrs. Kirkland with his hands, fists, a broken chair leg, and one of her own walking canes. Jones caused numerous injuries to Mrs. Kirkland's head and face, including two gashes to her face and forehead deep enough to "expose the bone." In addition to the injuries Jones inflicted with his hands, fists, or weapons, he also kicked Mrs. Kirkland, causing more multiple fractures to her ribs, sternum, and elbows. Further, Dr. Paredes testified, Jones "stomped" Mrs. Kirkland's breasts. Finally, Dr. Paredes testified that the injuries sustained by Mrs. Kirkland were as bad as any that he had ever seen in his professional career. Given these circumstances, the State presented sufficient evidence that Mrs. Kirkland's murder was especially heinous, atrocious, or cruel when compared to other capital offenses. Indeed, this Court has upheld the aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses on several occasions when a large male defendant inflicted multiple injuries on a petite and/or frail female victim — particularly an elderly female victim — in the course of a capital offense. See, e.g.,Walker v. State, 932 So.2d 140, 161
(Ala.Crim.App. 2004) (heinous, atrocious, or cruel aggravating circumstance upheld in burglary-homicide where defendant inflicted 9 injuries from blunt-force trauma before shooting the 87-year-old female victim); Hammonds v. State,777 So.2d 750, 776-77 (Ala.Crim.App. 1999), aff'd, 777 So.2d 777
(Ala. 2000) (heinous, atrocious, or cruel aggravating circumstance upheld in rape-homicide where defendant inflicted over 30 stab wounds to victim after raping a petite female victim); Ex parte McNair, 653 So.2d 353, 360-61
(Ala. 1994) (heinous, atrocious, or cruel aggravating circumstance upheld in robbery-homicide where defendant inflicted multiple stab wounds to 68-year-old female victim and left her to bleed to death). Accordingly, the trial court properly concluded that the murder of Mrs. Kirkland was "especially heinous, atrocious, or cruel." See Ex parteClark, 728 So.2d 1126, 1140 (Ala. 1998).
 IV.
As required by § 13A-5-53, Ala. Code 1975, we will now address the propriety of Jones's conviction and sentence of death.
The record reflects that Jones's sentence was not imposed under "the influence *Page 1171 
of passion, prejudice, or any other arbitrary factor." § 13A-5-53(b)(1), Ala. Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances and mandated a sentence of death. The court's sentencing order found the existence of three aggravating circumstances: (1) that the capital offense was committed while the defendant was engaged in the commission of a burglary in the first degree, see § 13A-5-49(4), Ala. Code 1975; (2) that the capital offense was committed by a person under sentence of imprisonment, see § 13A-5-49(1), Ala. Code 1975; and (3) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Ala. Code 1975. With regard to the finding that the victim's death was especially heinous, atrocious, or cruel when compared to other capital offenses, the court, which had set out extensive findings regarding Mrs. Kirkland's injuries and the suffering caused by those injuries in the factual background portion of the sentencing order, further noted: "Dr Paredes testified that an 80-year-old disabled woman was brutally beaten. He established that these injuries were painful and most preceded her death. This type of cruelty was unnecessary given the age and physical infirmities experienced by the victim." (C. 315.) The trial court then specifically addressed each of the mitigating circumstances enumerated in § 13A-5-51, Ala. Code 1975. The court found the existence of one of the mitigating circumstances, namely, the relative youth of Jones at the time of the crime.[5] The trial court also found the existence of several nonstatutory mitigating circumstances, as provided for in § 13A-5-52, Ala. Code 1975. The court identified the following nonstatutory mitigating circumstances:
 1. That Jones was reared in a single-parent home and had no relationship with his father;
 2. That Jones was hyperactive as a child;
 3. That Jones's family was visited by the Department of Human Resources several times during his childhood to investigate possible child abuse and/or neglect;
 4. That Jones did not resist arrest;
 5. That Jones had learning disabilities as a child and was a special-education student;
 6. That Jones was reared in the lower end of the socio-economic scale; and
 7. That Jones had suffered emotional and psychological problems.
The trial court then weighed the aggravating circumstances and the mitigating circumstances, concluding that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Jones to death.
The trial court's findings regarding the aggravating circumstances and the mitigating circumstances are supported by the record. However, § 13A-5-53(b)(2), Ala. Code 1975, requires this Court to weigh the aggravating and mitigating circumstances independently to determine the propriety of Jones's death sentence. After independently weighing the aggravating circumstances and the mitigating circumstances, we agree with the trial court's findings. Death is the appropriate sentence in this case.
As required by § 13A-5-53(b)(3), Ala. Code 1975, we must determine whether Jones's death sentence was disproportionate *Page 1172 
or excessive when compared to the penalties imposed in similar cases. Jones's death sentence is neither. Similar crimes have been punished by death on numerous occasions. See, e.g., Walker v. State, 932 So.2d 140
(Ala.Crim.App. 2004); Wynn v. State, 804 So.2d 1122
(Ala.Crim.App. 2000), cert. denied, 804 So.2d 1152 (Ala. 2001);Gaddy v. State, 698 So.2d 1100 (Ala.Crim.App. 1995), aff'd, 698 So.2d 1150 (Ala. 1997); Burton v. State,651 So.2d 641 (Ala.Crim.App. 1993), aff'd, 651 So.2d 659 (Ala. 1994);White v. State, 587 So.2d 1218 (Ala.Crim.App. 1990), aff'd, 587 So.2d 1236 (Ala. 1991); Thomas v. State,539 So.2d 375 (Ala.Crim.App.), aff'd, 539 So.2d 399 (Ala. 1988);Grayson v. State, 479 So.2d 69 (Ala.Crim.App. 1984), aff'd, 479 So.2d 76 (Ala. 1985). Therefore, we find that the sentence was neither disproportionate nor excessive.
Finally, as required by Rule 45A, Ala. R.App.P., we have searched the record for any error that may have adversely affected Jones's substantial rights and have found none. Jones's conviction and death sentence for the murder of Ruth Kirkland are due to be, and are hereby, affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and SHAW, JJ., concur.
[1] Jones identified these three men as Portaque Morris, Robert Carroll, and "Buddha Boy."
[2] The statement Jones gave to Officer Beeson was not admitted into evidence during the State's case-in-chief. However, Officer Beeson offered testimony concerning this statement during the State's rebuttal.
[3] As part of his defense, Jones offered the testimony of Malik Ali Hasan, who testified that he was with Jones on December 31, 1999. During the State's rebuttal, the prosecutor recalled Officer Beeson and questioned him about whether Jones had mentioned being with Hasan that night. Officer Beeson testified that at no point during the interview did Jones mention Hasan's name. Officer Beeson also testified regarding the identity of the three men Jones claimed had killed Mrs. Kirkland, and that Jones denied any involvement in the crime. At the conclusion of Officer Beeson's rebuttal testimony, defense counsel moved to strike Officer Beeson's testimony on the grounds that Jones's statement had not been knowingly, voluntarily, and intelligently given. (R. 1168.) The trial court denied the motion.
[4] Jones began his interview with Officer Beeson at approximately 2:55 a.m. on January 1, 2000. It is unclear how long that interview lasted. However, given that the transcript of that interview consists of more than 50 pages, the interview appears to have been rather lengthy. Therefore, it is unclear how much time elapsed between the end of the second interview and the beginning of the third interview, which began around 5:30 a.m.
[5] We note that Jones was 18 years old at the time he committed this offense. Therefore, the holding in Roper v.Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1
(2005), is inapplicable to this case.